19 A.3d 837

**600 NORTH FREDERICK ROAD, LLC**

v.

**BURLINGTON COAT FACTORY OF MARYLAND, LLC.**

**No. 89, Sept. Term, 2010.**

Court of Appeals of Maryland.

April 22, 2011.

Reconsideration Denied June 16, 2011.

**414**

416

James H. Hulme (Arent Fox LLP, Washington, DC; Douglas M. Bregman of Bregman, Berbert, Schwartz & Gilday, LLC, Bethesda, MD), on brief, for Petitioner.

Kurt J. Fischer (Melissa L. Mackiewicz of DLA Piper LLP (US), Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

*"Gallia est omnis divisa in partes tres. . . ."* [1] As the tribes of the three parts of ancient Gaul presented unique problems for Julius Caesar, an owner and a tenant, among the three

---

1. This is the opening line of Caesar's *Commentarii de Bello Gallico (Commentaries on the Gallic War),* well known to students of classical Latin. It translates as "Gaul is divided into three parts."

parcels comprising the subject real property of this case, present us with a matter of first impression in Maryland law.

This case requires us to determine if and when a declaration of covenants regarding real property (essentially a contract), which requires the owner(s) to be signatories to any modification in order to be effective, may be modified by the written consent of less than all of the owners. 600 North Frederick Road, LLC ("Petitioner")—owner of one parcel of the three-parcel tract of land in Montgomery County—appeals here from the judgment of the Court of Special Appeals affirming the judgment of the Circuit Court for Montgomery County approving such a modification. The Circuit Court held that Petitioner's predecessor in interest and the owner of one of the other parcels could modify bilaterally an earlier declaration executed and recorded by a single predecessor owner at a time when all three parcels were under single ownership—a modification that now limits Petitioner's development rights on its later-acquired parcel—notwithstanding that the earlier of the two declarations provided that any purported modification required the consent of the owner(s) of all three parcels. Further, the Circuit Court ruled that the revised declaration applied not only to any third-party (*i.e.,* non-owner) developer of the restricted parcel, but to Petitioner as owner of the proposed-for-development restricted parcel.

Petitioner claims here, as it did before the trial and intermediate appellate courts, that, because the original declaration required expressly the consent of the owner or owners of all of the parcels, an attempt to modify the agreement in a writing executed by less than all of the owners (or their successors or assigns) is ineffective, and, as such, the revised declaration is invalid and unenforceable. In response, Burlington Coat Factory of Maryland, LLC ("Burlington" or "BCF"), assignee-leaseholder on one of the parcels and an express beneficiary of the revised declaration, relies on authorities from other jurisdictions which hold effectively that two parties to a tripartite agreement may modify that agreement, in writing, provided that the modifications do not prejudice the non-signatory party. We hold, for reasons to be explained more fully *infra,*

that, because the foreign authorities upon which Burlington relies are consistent with Maryland appellate courts' long-standing jurisprudence regarding modification of contracts, the modifications in the revised declaration are valid and enforceable absent an adequate showing of prejudice by the non-consenting parcel's owners. Further, we hold that the restrictions contained in the revised declaration apply, not only to third-party developers of the restricted parcel, but also to Petitioner as owner of that parcel. Accordingly, although we agree with virtually everything held by the Court of Special Appeals, this case must be remanded to the Circuit Court for further proceedings not inconsistent with this opinion.

## I. FACTS AND LEGAL PROCEEDINGS

This case involves a tract of land in Gaithersburg, Montgomery County, Maryland. At some point prior to 1976, the tract was subdivided into three parcels, denominated as "Parcel One," "Parcel Two," and "Parcel Three." Parcel One, the smallest of the three lots (approximately 2.47 square acres in area), is situated on the northeast corner of the tract, at the intersection of Perry Parkway and North Frederick Avenue (Maryland Route 355). Parcel Two (approximately 7.53 square acres) is west of Parcel One, and also abuts Perry Parkway and Route 355. Parcel Three, the largest of the lots, is west of Parcels One and Two, and abuts Perry Parkway on the south, Montgomery Village Avenue on the northwest, and Route 355 on the northeast.

In 1976, all of the parcels were owned by Danac Real Estate Investment Corporation ("Danac"). On 22 April 1976, Danac entered into a thirty-year lease with Montgomery Ward & Co, Inc. ("Ward") involving Parcels One and Two. Pursuant to the lease, Ward constructed a retail store on Parcel One (the Leasehold) and the majority of its supporting surface parking on Parcel Two (the easement). Ward's use of Parcel Two for parking was subject expressly to Danac's right to develop Parcel Two. Ward's need for parking on Parcel Two would be accommodated in any development proposal by Danac, pre-

sumably by a parking structure or structures. The lease provided further that Danac was required to seek and obtain Ward's consent before commencing development on Parcels Two and/or Three, which consent was not to be withheld unreasonably. The lease was silent as to the precise location or types of any such future development. At the end of the original thirty-year lease term, Ward had the option, provided it was not in default at the time of its obligations under the Lease, to extend the lease for a period of ten additional years, with two additional options, each for a like period.

In 1980,[2] Danac entered into a contract with Realty Dealership Corporation ("RDC"), by which RDC was to acquire fee-simple title to Parcels One and Two, in the name of a wholly-owned subsidiary, Eretz Land Corporation ("Eretz"). Danac, prior to closing on the sale, agreed (and was permitted) to execute and record covenants reserving to itself development rights to Parcel Two. On 30 January 1981, Danac executed a "Declaration of Easement and Covenant" ("1981 Declaration"). The 1981 Declaration provided that, should Danac cease to be the fee simple owner of Parcel Two, Danac reserved the right, until 1 January 2001, to enter into a fifty-year ground lease with the owner, for an annual rent of $1,000.00. The proposed ground lease would grant Danac development rights on Parcel Two, provided that Danac would agree that "at the time [it] commences construction of any improvement on Parcel 2 ..., then such construction shall not commence until the owner of Parcel [One] shall have given its written consent to such construction, which consent shall not be unreasonably withheld."[3] Further, the 1981 Declaration re-affirmed expressly

---

2. The record reflects that, on 23 April 1979, Danac transferred a small portion of Parcel Three to the Maryland State Highway Administration, presumably for future construction of road improvements.

3. The declaration provided further that:

The owner of Parcel [One] may refuse to give its consent only because of the failure to provide the adequate substitute parking required by the lease on Parcel [Two] or because Danac did not provide proof of its financial ability to complete the proposed construction or to bond

the rights in Parcel Two of the tenant on Parcel One as granted by the 1976 Lease. Of particular importance to the present case, the 1981 Declaration provided that "[t]his declaration may be modified or canceled only by written instrument signed by the owners of the Parcels."[4] Danac conveyed Parcels One and Two to Eretz on 30 January 1981. The 1981 Declaration and the deed were recorded on 13 February 1981.

In October 1983, Danac sought Ward's consent (as required under the 1976 Lease and affirmed in the 1981 Declaration) to develop Parcel Two with an office complex. Ward—which closed its retail store on Parcel One in March 1983 (the building continued apparently to house two minor sub-tenants) and apparently was in negotiations with prospective assignees of its interest in the Lease—objected to Danac's plan, asserting that proposed buildings would destroy the line of sight of occupants of vehicles on Route 355 to Ward's store entrance, as well as the majority of the surface parking in front of the store. Believing apparently that the development as proposed would interfere with its ability to negotiate a favorable assignment of the Lease, Ward filed a complaint, on 16 October 1984, for declaratory judgment in the Circuit Court for Montgomery County against Danac and Eretz, asking the Circuit Court to:

> Enter an Order declaring that neither Danac, nor any of its successors or assigns, has any rights arising under the Declaration of Covenant and Easement dated January 30, 1981 and recorded February 13, 1981, or, in the alternative, should the Court find that Danac has development rights under the Declaration, then declaring exactly what rights Danac has thereunder.

---

the project to insure completion of satisfactory substituted parking. . . .

**4.** Earlier in the declaration, after referring to "Parcel 1," "Parcel 2," and "Parcel 3," the declaration added the parenthetical, "sometimes hereinafter referred to collectively as the 'Parcels.' " Therefore, in using the phrase, "the owners of the Parcels," the parties meant the owner or owners of Parcels One, Two, and Three.

Danac filed an answer and asserted various counterclaims, alleging that Ward "intentionally interfered with Danac's use and enjoyment of its rights by their refusal and failure to permit Danac to commence construction on Parcel [Two]."

During the pendency of that litigation, throughout 1987 and 1988, most [5] of Parcel Three was conveyed to the State Highway Administration, Corner Limited Partnership, and Point Limited Partnership. Further, while the litigation was ongoing, Danac and Ward continued negotiations regarding the scope of Danac's proposed development of Parcel Two. These negotiations culminated in the execution of an "Amended and Restated Declaration of Easements and Covenants" ("1992 Declaration")—signed by representatives of Purcell Investment Corporation (Danac's new name) (the developer of Parcel Two) and Eretz (the owner of Parcels One and Two)— whose purpose was to "amend and restate the [1981] Declaration in its entirety...." The 1992 Declaration reiterated that it was "intended to supersede and replace in its entirety the [1981] Declaration and any other documents granting development rights to Declarant [6] in Parcel [Two]," with "all such rights being hereinafter void *ab initio*." The 1992 Declaration restated Purcell/Danac's option, exercisable until 1 January 2001, to enter into a ground lease with the owner of Parcel Two, at $1,000.00 monthly. Importantly, the 1992 Declaration delineated (with somewhat greater specificity than the 1981 Declaration) restrictions on any future development on Parcel Two, limiting it to a specified "Restricted Development Area," and emphasizing that the 1992 Declaration's provisions "shall apply to and govern the construction of *any Future Improvements* on Parcel [Two], *whether or not the same shall be undertaken pursuant to the ground lease described* ....

---

**5.** The balance of Parcel Three was conveyed to Corner Limited Partnership in December 1995 and L–A Gaithersburg, LLC in April 1999.

**6.** The 1992 Declaration explained that the "Declarant is the owner of certain development rights with respect to 'Parcel [Two],'" and that "Parcel [Two is] currently encumbered by ... DANAC Real Estate Investment Corp" Thus, "Declarant," as used in the 1992 Declaration, refers to Danac.

*above."* [7] (Emphasis added.) To illustrate graphically the layout, configuration, and ownership interests of the three parcels at the time critical to resolution of this case in its present posture, we insert here Figure One, which we created based on an exhibit in evidence at trial, superimposed with other uncontested facts.[8]

### *Figure One*

### *Owners of the Three Parcels as of the Execution of the 1992 Declaration*

---

7. The 1992 Declaration also provided, similar to the 1981 Declaration, that any proposed construction (termed "Future Improvements" in the Declaration) on Parcel Two is subject to the consent of all holders of lease-hold interests in Parcel One, which consent may not be withheld unreasonably; the 1992 Declaration provided a non-exclusive list of factors the Parcel One tenants may consider in determining whether to withhold consent. Additionally, among the other restrictions, future construction on Parcel Two must not disturb ingress, egress, or traffic patterns; no such construction was permitted during the holiday shopping season between 1 October and 31 December; and, no residential development was permitted. No mention was made regarding Parcel Three or its development.

8. The record reflects that Danac conveyed a portion of Parcel Three to L–A Gaithersburg, LLC on 7 April 1999. Because this conveyance occurred after the execution of the 1992 Declaration, L–A Gaithersburg, LLC's ownership interest in Parcel Three is immaterial to the present case. Accordingly, its interests in the outcome of this case do not figure in the remand proceedings ordered here.

To illustrate the location of the Restricted Development Area delineated in the 1992 Declaration, we insert here Figure Two, which reflects the RDA in cross-hatching and is based on an exhibit in evidence below, modified slightly for clarity purposes.

Figure 2

On 22 July 1994, after the 1992 Declaration was executed (on 14 July 1992) and recorded (sometime between 14 and 22 July 1994), the 1984 litigation was dismissed with prejudice.

At some point prior to 1998, Burlington Coat Factory ("BCF") began investigating whether the largely vacant Ward store on Parcel One would be a suitable site in which to open one of its retail clothing stores. Robert Grapski ("Grapski"), BCF's Senior Vice President of Real Estate, explained that the covenant in the 1992 Declaration prohibiting residential development on Parcel Two was attractive to BCF as a potential tenant of the Ward store, opining that "residential mixed with retail [in close proximity] . . . is not a healthy mix."

Further, Grapski explained that the covenant against construction activities on Parcel Two during the Thanksgiving–Christmas holiday season was desirable to BCF, as BCF does sixty-to-seventy percent of its business in the holiday shopping season, and "to be under construction during that time of the year is suicidal." Ultimately, on 23 October 1998, Ward assigned to BCF its interest as tenant under the 1976 Lease and, thereafter, BCF began operating a retail store in the building on Parcel One, while continuing the subleases of parts of the building to Toys R' Us and a Ford automobile dealership. The BCF operation on Parcel One became one if its best stores in Maryland, placing in the top one-third based on net operating income.

In the Fall of 2003, Petitioner became interested in acquiring Parcels One and Two. After conducting a due diligence review, outside counsel for Petitioner determined that the 1992 Declaration was not binding on the owner of Parcel Two, but, as explained more fully *infra*, believed the covenants applied only to third-party developers of Parcel Two.[9] As a result, Petitioner, in December 2003, purchased Parcels One and Two. Soon thereafter, Petitioner entered into a development agreement with Avalon Bay Communities, Inc. ("Avalon Bay") to erect on Parcel Two a 394–unit apartment complex, retail stores, and a six-story parking garage. Discussions between Grapski and Avalon Bay's agent, who solicited BCF's consent to Avalon Bay's development plan, proved fruitless. Avalon Bay withdrew as a developer of Parcel Two.[10]

Petitioner engaged another developer for Parcel Two, JPI Enterprises, Inc. ("JPI"). Under their agreement, JPI would purchase and develop Parcel Two, and Petitioner would re-

---

9. Apparently, no contemporaneous judicial declaration was sought to confirm this conclusion as to the applicability (or non-applicability) of the 1992 Declaration.

10. After Grapski raised with Avalon Bay's agent that the 1992 Declaration prohibited residential development on Parcel Two, Avalon Bay's agent conceded that, in his view, its only chance of developing Parcel Two would be to "make a deal and make the [1992 Declaration] go away or you send me away."

main the owner of Parcel One. Petitioner's counsel wrote to Grapski, explaining that JPI's proposed development of Parcel Two included a 300–unit apartment complex, retail stores, and a parking garage. Petitioner's counsel expressed the view that, although Petitioner sought "to get feedback from Burlington on the plans, and obtain Burlington's full cooperation during the construction of the project," "[w]hether Burlington's consent is necessary is an open question legally...." After additional correspondence and meetings between counsel and representatives of Petitioner, BCF, and JPI,[11, 12] on 30 April 2007, counsel for BCF wrote to Petitioner to advise of its refusal to consent to the JPI project, explaining that the "construction would be in violation of numerous provisions of the [1992] Covenants and would substantially interfere with [BCF]'s operations at the site."

On 7 June 2007, Petitioner filed a seven-count "Complaint for Declaratory Relief" against BCF in the Circuit Court for Montgomery County, asking that the Circuit Court declare:

A. That the ... 1992 Document is unenforceable;

---

11. In the course of these dealings, Petitioner offered to buy BCF out of its lease, an offer that BCF rejected.

12. In December 2006, Grapski wrote to Petitioner exercising BCF's option to extend the term of the original Lease, as provided for in the 1976 Lease, for an additional ten years. Petitioner rejected initially BCF's exercise of the option, explaining that BCF "cannot ignore certain sections of the Lease [relating to granting consent to development on Parcel Two] which impose obligations and burdens on [BCF], while seeking to enforce other provisions which are to its benefit [*i.e.*, the option to extend the Lease]." Thereafter, counsel for BCF wrote to counsel for Petitioner, arguing that Petitioner could not reject BCF's exercise of its option to extend the lease because BCF was not in default under any material term of the Lease. The 1976 Lease provides that tenant is not in default—required in order for Petitioner to reject the exercise of the option—unless Petitioner provides written notice to tenant and such breach of the lease continues for sixty days. Counsel for BCF explained that because BCF had not received written notice of any breach on BCF's part, Petitioner's rejection of BCF's exercise of its option to extend the lease is ineffectual. Thereafter, apparently, Petitioner withdrew its rejection of BCF's exercise of the option, acknowledging that BCF had extended validly the lease.

B. That the ... 1992 Document failed to create an easement or covenant regarding Parcel [Two];

C. That ... [BCF] unreasonably withheld its consent and that the 1976 [Lease] permits construction of the J[PI] Development;

D. That ... [BCF] has waived its right to approve or disapprove the J[PI] Development;

E. In the alternative, that ... [Petitioner] is entitled to develop Parcel [Two] without regard to the easements and covenants Purcell and Eretz ... attempted to create in the 1992 D[eclaration] because the easements and covenants have outlived their usefulness;

F. In the alternative, that ... [Petitioner] is entitled to develop Parcel [Two] without regard to the easements and covenants Purcell and Eretz ... attempted to create in the 1992 D[eclaration] because the easements and covenants are extinguished through merger of interests;

G. In the alternative, [that Petitioner] is entitled to develop Parcel [Two] without regard to any easements and covenants created by Purcell and Eretz because [BCF] has an adequate remedy at law;

H. That the Court award [Petitioner] its costs and other relief in this action;

I. That the Court award further and supplementary relief as may be necessary or proper; and

J. That the Court award such other relief as the Court deems just and proper.

BCF filed an answer and counterclaim, asking the Circuit Court to declare that BCF did not withhold unreasonably its consent, and, pursuant to a fee-shifting provision in the 1976 Lease, to require Petitioner to pay its expenses and attorney's fees, assuming that BCF would be the successful party in the litigation.

On 21 January 2008, Petitioner moved for summary judgment, arguing generally that the 1992 Declaration is unen-

forceable and/or void for mutual mistake and lack of consideration. BCF opposed Petitioner's motion and filed a cross-motion for summary judgment, arguing generally that the 1992 Declaration is valid and enforceable, and that it prohibits the proposed JPI development on Parcel Two. Following a hearing, the Circuit Court, by order and memorandum opinion, on 4 June 2008, ruled that: (1) the issue of whether there was adequate consideration for the 1992 Declaration was withdrawn by Petitioner and thus moot; (2) the 1992 Declaration did not create an interest that violates the Rule Against Perpetuities or an unreasonable restraint on alienation of property; (3) the covenants contained in the 1992 Declaration run with the land; (4) the 1992 Declaration was not based upon a mutual mistake of fact; and (5) Petitioner did not breach the 1976 Lease merely by advancing JPI's proposal to develop Parcel Two. The Circuit Court, however, denied the parties' competing motions for summary judgment regarding the following issues, deferring their resolution for a trial:

(a) [Whether] the 1992 Declaration of Easements and Covenants [was ambiguous].

(b) The validity ... of the 1992 covenants because Eretz ... could not create easements for restrictions on its own land.

(c) Whether ... there has been a [subsequent] change in circumstances in the neighborhood which would render the 1992 covenants invalid.

(d) Whether the 1992 covenants are ... subject to specific performance.

(e) Whether the 1992 covenants apply to ... the owner of Parcel No. 2.[13]

---

**13.** This is the only of the issues raised pre-trial before us. The other issue we shall consider—namely, whether the 1992 Declaration is valid and enforceable notwithstanding the fact that the owners of Parcel Three were not signatories to it—was raised for the first time by Petitioner in its opening statement at trial, and again in its proposed conclusions of law submitted to the trial court after trial. The trial court rejected BCF's claim that Petitioner waived the argument regarding the necessity of the Parcel Three owners to sign the 1992 Declara-

(f) Whether the 1992 covenants are invalid because they only "confirm" rights in the 1981 Declaration that were allegedly invalid.

(g) Whether or not [BCF] ... withheld [unreasonably] consent to the landlord's proposed future improvements under Section 16.2 of the lease.

At trial, Petitioner injected another issue, namely, whether "the 1992 Declaration is invalid because it was not signed by the owners of Parcels [One], [Two] and [Three] as required by the 1981 Declaration." Resolution of this flagship issue is at the core of the present case.

On 27 May 2009, the Circuit Court, in a thirty-three page memorandum opinion, rejected Petitioner's claim that "the 1992 Declaration's restrictions on 'Developer' are not applicable to the Owner of Parcel [Two]," explaining rather that:

The express language and structure of the 1992 Declaration make it clear that the restrictions apply not only to the construction of Future Improvements by Purcell pursuant to a ground lease, but also to any Future Improvements constructed by anyone on Parcel [Two] after the expiration of the ground lease.

Next, regarding the missing-signatories argument, the Circuit Court held that the 1992 Declaration was valid and enforceable notwithstanding the fact that the owners of Parcel Three were not signatories to it, relying on the California Supreme Court case of *Hotle v. Miller*, 51 Cal.2d 541, 334 P.2d 849 (1959), and explaining that, because "[t]he rights of the Parcel [Three] owner were not affected by the 1992 Declaration," under "Maryland law, the only signatures needed were those of the owners of Parcels [One] and [Two]."

tion, explaining that "failure to raise an argument in a motion for summary judgment [or in the complaint, amended complaint, cross-motions for summary judgment, or a pre-trial memorandum] does not preclude a party from raising the argument during trial." In any event, because the issue regarding the necessity of the Parcel Three owners to sign the 1992 Declaration was one "decided by the trial court," as contemplated by Maryland Rule 8–131(a), it is properly before this Court.

Petitioner appealed timely to the Court of Special Appeals. The Court of Special Appeals, in an unreported opinion, discussed: (1) the validity of the 1992 Declaration; (2) assuming the validity of the 1992 Declaration, the application of the 1992 Declaration to Petitioner as the owner of Parcel Two; and (3) whether BCF"s withholding of consent to development of Parcel Two was unreasonable. In agreeing with the Circuit Court regarding the missing-signatories argument, the panel of the intermediate appellate court explained:

It is not uncommon in multi-party contracts covering a variety of matters for the parties to have common interests in some matters but not others. Matter A may be of interest to only two of the parties, although all may have an interest in matter B. If the only two parties with an interest in Matter A later wish to modify their agreement as to that matter and their proposed modification would not adversely affect any other party, we see no reason why they should not be permitted to make that modification.[14]

Regarding the issue of whether the 1992 Declaration applied to Petitioner as the owner of Parcel Two, or applied merely to third-party developers of Parcel Two, our appellate brethren explained:

We see nothing in th[e 1992 Declaration] ... limiting those restrictions and burdens to development carried on by third-party developers or in any way exempting the owner of Parcel [Two] from them. Indeed, ¶ 2 specifies the contrary by defining "developer" as "[t]he entity undertaking *any such Future Improvements* " (emphasis added), which would necessarily include *any* entity undertaking the improvements, whether the owner of Parcel [Two] or some other entity.

---

**14.** Also regarding the validity of the 1992 Declaration, the Court of Special Appeals rejected Petitioner's contentions that "the Declaration merely confirmed and modified the 1981 [Declaration] and that, because those covenants were not preserved in the contemporaneous deed to Eretz, they vanished and were no longer subject to conformation or modification," and that it was impermissible for Eretz, as owner of both Parcels One and Two, to create easements in favor of Parcel One.

Finally, regarding the issue of whether BCF's withholding of consent to development of Parcel Two was unreasonable, the Court of Special Appeals opined:

[F]rom the very beginning, the tenants on Parcel [One] objected to any development on Parcel [Two] that would substantially injure their ability to conduct their business—by interfering with the visibility of the store from Route 355 and with ingress and egress from that road to and from the parking area, and by substantially limiting the parking area necessary to attract customers. Montgomery Ward made that clear in 1983 and [BCF] made it clear when presented with the various plans. The plain, simple fact is that [Petitioner] had insisted, presumably for its own economic reasons, on utilizing nearly all of the area of Parcel [Two] for a mixed-use office, retail, and residential development and that all of the plans for that kind of development not only violate the requirement that development be restricted to the area specified in the 1992 Declaration but also would do the very thing that the [BCF] ha[s] consistently and legitimately expressed concern about and opposed. There is substantial evidence in the record supporting the Circuit Court's conclusion that [BCF] acted reasonably and in good faith.

600 North Frederick Road, LLC, filed timely a Petition for Writ of Certiorari, which we granted, *600 N. Frederick Road, LLC v. Burlington Coat Factory of MD, LLC,* 416 Md. 272, 6 A.3d 904 (2010), to consider:

1. Whether a recorded written instrument requiring the signatures of a defined set of property owners to cancel or modify it can be modified by fewer than all based on an allegation that extrinsic evidence shows that the non-signing property owners are not adversely affected by the modification?

2. Whether potentially perpetual restrictions on the use of land may be imposed under the rule of reasonably strict construction without applying the traditional rule of

contract interpretation that every provision in a written instrument must be given meaning, if possible?

3. Under the rule of reasonably strict construction, may a court imply restrictions on the use and development of land or must such restrictions be clearly stated in a document applicable to the property owner?

For the reasons that follow, although we agree with the holding and much of the reasoning of the opinion of the Court of Special Appeals, we must vacate its judgment and remand the case to that court with directions to remand the case to the Circuit Court for Montgomery County for further proceedings not inconsistent with this opinion.

## II. STANDARD OF REVIEW

In the present case, we are reviewing the declaratory judgment of the Circuit Court for Montgomery County, issued by way of memorandum opinion following a bench trial. Maryland Rule 8–131(c) ("Action tried without a jury") provides:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

The question of whether circumstances exist in which a contract (even a declaration containing covenants pertaining to real property), requiring the parties to be signatories to any written modification for the modification to be effective, may be modified nonetheless with the consent of less than all of the parties, is a question of law that we review under a non-deferential standard. *See Parker v. State*, 408 Md. 428, 437, 970 A.2d 320, 325 (2009) ("When the trial judge's ruling involves a legal question ..., we review the trial court's ruling *de novo*."). Further, resolving Petitioner's question relating to whether the 1992 Declaration applies to it as the owner of Parcel Two, or merely to third-party developers of Parcel

Two, involves the interpretation of the 1992 Declaration, a purely legal issue which we also review under a non-deferential standard. *See Nova Research, Inc. v. Penske Truck Leasing Co., L.P.,* 405 Md. 435, 448, 952 A.2d 275, 283 (2008) ("The interpretation of a written contract is a question of law for the court subject to *de novo* review.").

## III. ANALYSIS

### A. Justiciability

■ In its complaint in the Circuit Court, Petitioner averred that BCF "has unreasonably withheld its consent to the construction of the J[PI] Development." In its unreported opinion, the Court of Special Appeals concluded that "[t]here is substantial evidence in the record supporting the Circuit Court's conclusion that [BCF] acted reasonably and in good faith" in withholding consent to the JPI development on Parcel Two. According to BCF, "[b]ecause [Petitioner] has not challenged before this Court this separate and independent basis for the decisions of the Courts below, the questions that [Petitioner] presents before this Court as to the validity of the 1992 [Declaration] are not justiciable." *See Bailiff v. Woolman,* 169 Md.App. 646, 653, 906 A.2d 409, 413–14 (2006), *cert. denied,* 396 Md. 12, 912 A.2d 648 (2006) (quoting *Johnson v. Commonwealth,* 45 Va.App. 113, 609 S.E.2d 58, 60 (2005) (noting that "the majority of jurisdictions hold[ ] that in situations in which there is one or more alternative holdings on an issue, the appellant's failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue")) (internal quotation marks omitted). We are unpersuaded by this argument.

The Circuit Court's rationale for why BCF's withholding of its consent to the JPI development plan for Parcel Two was not unreasonable was not a "separate and independent basis" for the declaration by the Circuit Court. That is, the Circuit Court, although tipping its hand as to the merits of whether the consent was withheld unreasonably, ruled ultimately that:

> [T]he declaration [Petitioner] seeks is nothing more than an advisory opinion as to whether BCF was unreasonable in withholding its consent to a development contract that has since expired. The [Petitioner] cannot seek such declaration because addressing non-justiciable issues places courts in the position of rendering purely advisory opinions, a long forbidden practice in Maryland.

Thus, because the Circuit Court's memorandum opinion on this point was expressed in an "oh, by the way" manner, it cannot constitute a "separate and independent basis" for its ruling, such that the failure to point to that basis on appeal would make the issues before this Court moot.[15] *See Bailiff,* 169 Md.App. at 653, 906 A.2d at 414 (quoting *Johnson,* 609 S.E.2d at 60) (stating that "we still must satisfy ourselves ... that the alternative holding is indeed the one that ... would legally constitute a freestanding basis in support of the trial court's decision").

In any event, it is not a surprise that Petitioner does not ask us to determine whether BCF"s withholding of consent as to the development proposal for Parcel Two was unreasonable, considering, as decided correctly by the Circuit Court, that issue was rendered moot by the fact that the contracts with Avalon Bay and JPI expired. The issues we explore today involve not the parties' actions with respect to any potential development that was proposed in the past, but rather, the vitality and reach of the 1992 Declaration and, if effective, how the parties (and their successors and assigns) must conduct themselves under the 1992 Declaration prospectively.

---

15. The Court of Special Appeals addressed the issue of whether BCF withheld consent to the development of Parcel Two unreasonably, likely because BCF raised the issue in its reply brief before that court. The intermediate appellate court, acknowledging that the Circuit Court noted both (1) that the issue was moot and non-justiciable, and (2) that consent was not unreasonably withheld, declined to address the mootness determination, agreeing with the Circuit Court's determination that consent was not withheld unreasonably. We take the opposite view.

## B. The Case of the Missing Signatories

### 1. *The Parties' Contentions*

In its first challenge to the validity of the 1992 Declaration, Petitioner argues that "the 1992 [Declaration] was invalid because all of the Parcel owners [16] did not sign it." More specifically, Petitioner argues that the 1992 Declaration—"intended to supersede and replace in its entirely the [1981] Declaration and any other documents granting development rights in Parcel [Two]"—could not modify or replace the 1981 Declaration without the signatures of the Parcel Three owners, considering that the 1981 Declaration provided expressly that it "may be modified or cancelled only by written instrument signed by the owners of [all] of the Parcels." Such a result, Petitioner continues, is "required, because, in Maryland, the unambiguous language of the contract controls, and there is 'no room for construction.' " (quoting *Bd. of Trs. of the State Colls. of Md. v. Sherman*, 280 Md. 373, 380, 373 A.2d 626, 629 (1977)).

In response, BCF contends that Petitioner's "suggestion that the 1992 [Declaration is] invalid because the Parcel [Three] Owners did not join them is contrary to settled contract law." Rather, BCF argues, "the parties to a contract remain free to modify the contract or create a new agreement as long as the modification does not alter or affect the rights of a party who does not join in the modification," and that "so long as it does not affect the rights of a party that does not join, a contract modification is binding on those parties that join in the modification, but not on parties that fail to join in it."

Because BCF (and the Circuit Court and the Court of Special Appeals) rely for support on (and Petitioner attempts

---

16. Presumably, Petitioner would require the signatures of authorized representatives of the State Highway Administration ("SHA"), Corner Limited Partnership ("Corner"), and Point Limited Partnership ("Point"), which owned various interests in Parcel Three as of 1992, saving and excepting that part not acquired by Corner until 1995. *See supra* note 5.

to distinguish) the California Supreme Court's opinion in *Hotle, supra,* we shall consider that case first. In *Hotle,* a husband and wife opened a bank account, executing a deposit agreement that provided:

> [A]ll moneys now or hereafter deposited by us or either of us with the bank in this account ... shall be the property of both of us as joint tenants and shall be payable to and collectable by either of us during our joint lives, and after death of one of us shall belong to and be the sole property of the survivor....

*Hotle,* 334 P.2d at 850. More than a decade after the bank account was opened, and without the consent of or knowledge by the bank, the husband and wife "orally agreed that regardless of how title was held, all of their property had been acquired as their community property...." *Id.* Thereafter, the husband executed a will "in which he undertook to dispose of all of the community property, and [wife] executed a waiver of claim to her share of the community property in view of her election to accept the terms of the will." *Id.* When he died, executors of his estate sought to treat the deposit agreement as modified by the couple's subsequent agreement, such that they could distribute the balance of the bank account as community property, in accordance with the terms of the will. *Id.* Executors of the now-deceased wife's estate, argued, however, that "the [oral] agreement cannot operate to change the rights of the parties in the joint tenancy bank account, [and] that title to it therefore vested in [the wife] when she survived [the husband]...." *Id.*

The California Supreme Court, speaking through Justice Roger Traynor, explained that although the deposit agreement—which was in conformance with a statute existing at the time the agreement was executed, but which had been repealed by the time of the filing of the court's opinion—"is conclusive evidence of the intention of the depositors at that time to vest title in the survivor .... [i]t in no way deprives the depositors of their freedom of contract to make subsequent agreements changing their interests in the account." *Hotle,* 334 P.2d at 851. The court noted two cases—*Ehrman*

*v. Rosenthal,* 117 Cal. 491, 49 P. 460 (1897), and *Fitts v. Mission Health and Beauty Shop,* 58 Cal.App. 362, 208 P. 691 (1922)—commenting that "those cases correctly hold that two parties to a tripartite agreement cannot change it to the prejudice of the third party." *Hotle,* 334 P.2d at 852; *see Lakeshore Commercial Fin. Corp. v. Drobac,* 107 Wis.2d 445, 319 N.W.2d 839, 845 (1982) (stating that *Hotle* stands for the proposition that "parties can change the relationships between themselves and that a new contract is valid, although such subsequent contract cannot diminish the rights nor increase the obligations of original signatories to the agreement; but, as between themselves, the assenting parties are bound").

Interpreting *Hotle* in the present case, BCF contends that "the 1992 [Declaration] could supplement the 1981 [Declaration] as between the Owner and Tenant of Parcels [One] and [Two], without the agreement of the Owners of Parcel [Three], because the[ latter] had no right whatsoever under the 1981 [Declaration] to control the nature and scope of development on Parcel [Two]." In response, Petitioner argues that the rule in *Hotle* is "contrary to the prior holdings of this [C]ourt, . . . . [considering that] the Court has previously held that the making of a valid contract requires signatures where 'the parties have made them necessary at the time they expressed their assent and as a condition modifying that assent." (quoting *Porter v. Gen. Boiler Casing Co.,* 284 Md. 402, 410–11, 396 A.2d 1090, 1095 (1979)). Further, Petitioner contends "the invention of the 'no prejudice' standard for recorded instruments is unworkable and unwise," as "when a later modifying document is missing necessary signatures, a title searcher will have to launch an investigation to determine whether the missing parties are prejudiced by the later attempt at modification or cancellation." Next, allowing a modification of the 1981 Declaration with less than all of the signatures required in the modification document, as Petitioner's argument goes, runs contrary to Maryland's approach to applying a "reasonably strict construction" when construing covenants. And finally, Petitioner urges that *Hotle* is factually inapposite, as *Hotle* "did not involve documents recorded among the land

records—among the most formal and solemn documents known to the law," and that "application of the rule to the bank deposit card [in *Hotle* ] is a totally different circumstance than the application of the rule to formal, recorded legal instruments."

### 2. *Our Analysis*

Generally, "[w]here the language of [a] contract is unambiguous, its plain meaning will be given effect." *Aetna Cas. & Surety Co. v. Ins. Comm'r, State of Md.*, 293 Md. 409, 420, 445 A.2d 14, 19 (1982); *see Kasten Const. Co. v. Rod Enters., Inc.*, 268 Md. 318, 330, 301 A.2d 12, 19 (1973) ("[T]he Court may not, under the guise of construction, rewrite the contract made by the parties...."). There are exceptions, however, to this rule. For instance, "the common law rule is that even where the contract specifically states that no non-written modification will be recognized, the parties may yet alter their agreement by parol negotiation." 2 JOSEPH M. PERILLO & HELEN HADJIYANNAKIS BENDER, CORBIN ON CONTRACTS § 7.14 (Rev. ed. 1995) (internal quotation marks omitted); *see Univ. Nat'l Bank v. Wolfe*, 279 Md. 512, 522, 369 A.2d 570, 576 (1977) (holding that parties may modify their original agreement orally "notwithstanding a written agreement that any change to a contract must be in writing"); *Freeman v. Stanbern Const. Co.*, 205 Md. 71, 78, 106 A.2d 50, 54 (1954) ("The rule has been accepted ... that, even though a written contract stipulates that it may not be varied except by an agreement in writing, nevertheless the parties, by a subsequent oral agreement, may modify it by mutual consent."). Thus, in some instances, the law—whether it be the common law of contracts or statutory provisions—may operate to allow supplementation or even modification of the express terms of a valid contract. *See Mortgage Investors of Wash. v. Citizens Bank and Trust Co. of Md.*, 278 Md. 505, 509, 366 A.2d 47, 49 (1976) (recognizing "the rights of parties to make ... contracts as they please, *so long as they are consistent with law* ") (emphasis added); *Drobac*, 319 N.W.2d at 845 ("[I]t is the law, not private agreements, which determines the essen-

tial elements of a valid contract."). The issue in the present case, then, is whether allowing a declaration, requiring certain parties to be signatories to it in order for a modification to be effectual, to be modified with the written consent of less than all of the parties required by the original undertaking, is such an exception. It appears that this is an issue of first impression in Maryland.[17]

■ Maryland jurisprudence has considered with some frequency allowance of the modification of contracts. *See, e.g., Comptroller of the Treasury v. Citicorp Int'l Commc'ns, Inc.,* 389 Md. 156, 185, 884 A.2d 112, 129 (2005) ("[P]arties to a written contract are usually free to modify or terminate . . . contract[s] by separate agreement. . . ."); *Charles Burton Builders, Inc. v. L & S Constr. Co., Inc.,* 260 Md. 66, 88, 271 A.2d 534, 545 (1970) (quoting *Freeman,* 205 Md. at 80, 106 A.2d at 55) ("Attempts of parties to tie up by contract their freedom of dealing with each other are futile."); *see also* CORBIN ON CONTRACTS, *supra* § 7.14 ("[C]ontracting parties cannot today restrict their power to contract with each other tomorrow."). Because we think the rule enunciated in *Hotle*

---

**17.** Petitioner's reliance on *Porter v. General Boiler Casing Co.,* 284 Md. 402, 396 A.2d 1090 (1979), is misplaced. Petitioner, in its opening brief, quotes *Porter* for the proposition that "the making of a valid contract requires signatures where 'the parties have made them necessary at the time they expressed their assent and as a condition modifying that assent," and, accordingly, because the signatures of the owners of Parcel Three were missing, the 1992 Declaration should be given no legal effect. That portion of *Porter,* however, did not answer the question of *which parties* to an agreement must sign a modification in order for that modification to be effectual; rather, the cited-to portion involved a general discussion of whether signatures are required, *in the first place,* in order to bring a contract into existence. To this point, the Court in *Porter* stated more fully:

"So far as the common law is concerned, the making of a valid contract requires no writing whatever; and even if there is a writing, there need be no signatures unless the parties have made them necessary at the time they expressed their assent and as a condition modifying that assent."

*Porter,* 284 Md. at 410, 396 A.2d at 1095 (quoting 1 A. Corbin, *Contracts* § 31 at 114 (1963)). Thus, the issue of *which parties* to an agreement must sign a modification in order for that modification to be effectual remains an open question in this State.

and elsewhere—that two parties to a tripartite agreement may modify the original agreement, provided such modification in no way prejudices the interests of the third, non-consenting party—is consistent with this pragmatic policy favoring recognition of modification of contracts, we adopt it.[18] Such a conclusion is in line with nearly every jurisdiction of which we are aware that has decided the issue. *See Drobac,* 319 N.W.2d at 845 ("[T]hey cannot contract with each other by way of a modification in a manner that affects the rights of an original contracting party *who is prejudiced* by the new agreement and has not assented to it.") (emphasis added); *Hening v. Maynard,* 227 Va. 113, 313 S.E.2d 379, 382 (1984) ("[E]xisting restrictions cannot be amended or terminated unless *all* parties *affected by the restrictions* . . . agree to the amendment or termination.") (second emphasis added); *Spiegel v. Hays,* 103 Ga.App. 293, 119 S.E.2d 123, 128 (1961) ("It is a general rule that the terms of a tripartite agreement cannot be modified *to the detriment of one of the parties* by the others without his consent.") (emphasis added); *see also* 17A C.J.S. *Contracts* § 410 (1999) ("The terms of a tripartite agreement cannot be modified *to the detriment of one of the parties* by the other two without the former's consent.");

---

18. At oral argument before this Court, Petitioner argued:

> "If you had a three-party contract that didn't have that provision [requiring the signatures of the owners of Parcels One, Two, and Three] and later, two of the parties tried to modify the contract, yes, you'd have an argument that that modification as between the two that modified it would be valid. But here, it is a different situation; you have an original written instrument that says it cannot be changed unless everybody agrees and then two people try to modify it."

Presumably, Petitioner attempts to distinguish *Hotle* on the ground that the deposit agreement in *Hotle* did not say expressly that the bank had to consent to any modifications of the tripartite deposit agreement, whereas, in the present case, the 1981 Declaration did say expressly that all Parcel owners must consent to any modification of it. This is a distinction without a difference. If the law is as we declare it here— namely, that two parties to a tripartite agreement may modify that agreement, at least between them, if the non-consenting party is not prejudiced thereby—this rule would apply not only to contracts that are silent on this point, but also those whose express terms are to the contrary.

Amelia H. Boss, *Panacea or Nightmare? Leases in Article 2,* 64 B.U. L. REV. 39, 76–77 (1984). *But see Utils. Ins. Co. v. Stuart,* 134 Neb. 413, 278 N.W. 827, 832 (1938).

 That Maryland courts apply a "reasonably strict construction," *see Miller v. Bay City Property Owners Ass'n, Inc.,* 393 Md. 620, 634, 903 A.2d 938, 946 (2006), to the interpretation of restrictive land covenants does not necessitate a different conclusion. Applying properly a reasonably strict construction to interpretation of restrictive covenants means that "if there is ambiguity in [a restrictive covenant's] meaning, any doubt should be resolved in favor of the unrestricted use of the property, if it reasonably can be done." *Baltimore Butchers Abattoir & Live Stock Co., Inc. v. Union Rendering Co.,* 179 Md. 117, 123, 17 A.2d 130, 133 (1941). Acceptance of the present proposition—whether two parties to a tripartite agreement may modify the original agreement, provided such modification in no way prejudices the third party—does not require us to interpret or construe either the 1992 or 1981 Declarations. That is, the 1981 Declaration provides unambiguously that all owners of the parcels that are the nominal subject of the declaration are supposed to consent normally to any modification of that document. The legal issue with which we grapple, however, is, this language notwithstanding, whether the owners of Parcels One and Two could execute validly the 1992 Declaration without the consent of the Parcel Three owners. Because this is a purely legal issue that does not require us to interpret or construe restrictive covenants, the concept of "reasonably strict construction" has no place in this analysis of this question.

Declaring that we subscribe to and apply in this case the rule in *Hotle* does not end our inquiry, however. Under that rule, "two parties to a tripartite agreement cannot change it *to the prejudice of the third party.*" *Hotle,* 334 P.2d at 852 (emphasis added). Thus, our inquiry shifts to whether the Parcel Three owners are prejudiced by the 1992 Declaration, for, if they are, the 1992 Declaration may be nothing more than an unsuccessful attempt to modify and replace the 1981

Declaration. The Circuit Court, in this suit where the owners of Parcel Three are not parties and did not participate in any capacity, found baldly that "[t]he rights of the Parcel [Three] owner were not affected by the 1992 Declaration." The Court of Special Appeals opined:

> In this case, as we have observed, the owners of Parcel [Three] in 1992 had no apparent interest in the modifications made with respect to the development rights regarding Parcel [Two]. If they had such an interest, they could have objected to the 1992 Declaration, which was recorded, and sought to upset it, at least to the extent that it affected them. It is not for [Petitioner], however, who was not even a party either to the 1981 Declaration or the 1992 Declaration, retroactively (15 years later) to raise an objection on their behalf.

To this point, Petitioner argues to us:

> The finding of "no prejudice" was not based on any evidence in the record. No Parcel Three owner testified one way or the other. If anything, there is real evidence of prejudice to Parcel Three because the 1992 [Declaration] purports to limit the only development of Parcel Two to the back corner of Parcel Two, immediately adjacent to Parcel Three on two sides. Thus, the 1992 [Declaration]'s restrictions have a direct and substantial impact on Parcel Three because of the location of the "Restricted Development Area" defined in the 1992 [Declaration]. Neither lower court—in making the finding of "no prejudice"—considered this undisputed fact.

In response, urging that the 1992 Declaration in no way prejudices the relevant owners of Parcel Three, BCF avers:

> Under the 1981 Covenants, the Parcel [Three] Owners had no right to restrict future development on Parcel [Two] in any way. Thus, the restrictions on development contained in the 1992 [Declaration] are entirely consistent with, and do not affect, or conflict with, any right that the Parcel [Three] Owners had under the 1981 [Declaration]. Accordingly, the [Petitioner]'s suggestion that the 1992 [Declara-

tion is] invalid because the Parcel [Three] Owners did not join in them is contrary to settled contract law.

Absent extrinsic evidence to the contrary (none of which we could find in this record), nothing in the 1992 Declaration seems to affect, negatively and patently, the rights of the relevant owners of Parcel Three to develop Parcel Three, then-existing under the 1981 Declaration. That is not to say, however, that the only form of prejudice capable of defeating a bilateral modification of a tripartite agreement is hindrance of development rights. We think it would be unfair, without giving the relevant owners of Parcel Three an opportunity to be heard, to declare affirmatively at this point that, because the current record is devoid of any demonstrable evidence of prejudice to the owners of Parcel Three, they will suffer no prejudice from the 1992 Declaration. There is not an abundance of reported cases discussing the extent to which two parties may modify a tripartite agreement; certainly not enough to make the rule adopted and applied today a well-settled rule of law such that the owners of Parcel Three could be charged reasonably to have been on notice to make known any potential prejudice they would suffer as a result of the 1992 Declaration.

Therefore, on remand, the owners of Parcel Three should be permitted to weigh-in, as parties or otherwise, if they wish, and the Circuit Court to offer and, if necessary, conduct an evidentiary hearing—allowing the owners of Parcel Three to participate [19]—with the goal of determining whether the owners of Parcel Three are prejudiced [20] by the 1992 Declaration.[21]

---

**19.** Corner acquired a large portion of Parcel Three in 1988 and a small portion of that Parcel in 1995. Because the inquiry on remand will focus on any prejudice suffered by the owners of record Parcel Three at the time the 1992 Declaration was executed, any prejudice suffered by Corner relating to its later-acquired (*i.e.* 1995) interest in Parcel Three is immaterial to that inquiry.

**20.** Admittedly, the cases supporting this legal principle—that two parties may modify a tripartite agreement where the modification does not prejudice the non-consenting party—do not elucidate what constitutes "prejudice" sufficient to defeat the modification. We note, however,

If the Circuit Court determines they are not so prejudiced or if, after notice the owners of Parcel Three fail to assert any prejudice, the Circuit Court's declaration that the 1992 Declaration is valid and enforceable should stand. If, however, the Circuit Court determines, upon an adequate and persuasive showing, that the owners of Parcel Three are prejudiced by the 1992 Declaration (and assuming the owners of Parcel Three do not consent to the 1992 Declaration and did not waive their right to assert prejudice), it may reconsider its earlier declaration that the 1992 Declaration is valid.

### C. Assuming the 1992 Declaration is Valid, To Whom Does It Apply?

#### 1. *The Parties' Contentions*

Petitioner argues that, should we find that the 1992 Declaration is valid and enforceable, we should conclude nonetheless that "the onerous restrictions of the 1992 [Declaration] never were intended to be applied to the owner [of Parcel Two]" and that it applies merely to third-party developers. Petitioner contends generally:

> that our courts, albeit in a different context, have defined "prejudice" as " 'injury or damage resulting from some judgment or action of another in disregard of one's rights....' " *Elste v. ISG Sparrows Point, LLC*, 188 Md.App. 634, 654, 982 A.2d 938, 949–50 (2009), *cert. denied* 412 Md. 495, 988 A.2d 1009 (2010) (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed.)); *see Lakeshore Commercial Fin. Corp. v. Drobac*, 107 Wis.2d 445, 319 N.W.2d 839, 845 (1982) (noting that the non-consenting party had not been prejudiced where "[n]o one assert[ed] that [the non-consenting party's] duties ... are changed by the modification"); BLACK'S LAW DICTIONARY 1299 (9th ed. 2009) (defining "prejudice" as "[d]amage or detriment to one's legal rights or claims"). That definition seems to us a reasonable one in this context as well.

21. At oral argument before this Court, there was suggestion made of some common business or legal relationship or ties between Danac/Purcell, 600 North Frederick Road, LLC, and/or Corner and Point. Our examination of the record, consisting of thousands of pages, revealed scant evidence regarding Corner Limited Partnership or Point Limited Partnership or any potential relationship they had with Danac/Purcell or Petitioner. Insofar as such possible cross-ties may bear on waiver implications, that also may be fit to be explored on remand.

The courts below found that the 1992 [Declaration]'s restrictions applied with full force to the Owner. To reach that result, the courts below ignored and failed to apply long-standing principles developed by this Court to construe restrictions such as those imposed by the 1992 [Declaration]. First, the lower courts did not consider the contract's character, purpose, and the facts and circumstances of the parties at the time of execution.[22] Second, the courts did not follow substantial precedent from this Court that such restrictions on the use of land are not favored. Third, the courts below did not resolve any doubts regarding the restrictions in favor of the use of land. And, finally, the courts failed to apply basic principles of contract construction when they adopted a contract interpretation that made provisions of the contract surplusage without any purpose.

(Internal citations and quotations omitted.) BCF replies:

The Landlord's interpretation on its face is convoluted and contrary to the plain and unambiguous language of the 1992 [Declaration]. The restrictions in §§ 2, 5 and 6 apply to any Future Improvements regardless of the person or entity that constructs them. Sections 2(c) and 6(a) flatly state that no development may proceed outside the RDA and no development may occur anywhere on Parcel [Two] without the consent of the Parcel [One] Tenants. Further, the Landlord's interpretation ignores the fact that other restrictions in § § 2 and 6 apply to any "Developer" which term is expressly defined to include any entity that undertakes to construct any Future Improvements on Parcel [Two] at any time.

### 2. *Our Analysis*

 In *City of Bowie v. MIE Properties, Inc.*, 398 Md. 657, 679–80, 922 A.2d 509, 522–23 (2007), we reiterated "the

---

**22.** To this point, Petitioner argues, more specifically, that "the inapplicability of the restrictions to the Owner of Parcel Two makes sense from the extrinsic circumstances because the Owner's right to develop its property was not at issue in the lawsuit that gave rise to the 1992 [Declaration]."

manner in which restrictive [land] covenants are read and interpreted generally by Maryland courts":

"In construing covenants, it is a cardinal principle ... that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself. The language of the instrument is properly considered in connection with the object in view of the parties and the circumstances and conditions affecting the parties and the property.... This principle is consistent with the general law of contracts. If the meaning of the instrument is not clear from its terms, the circumstances surrounding the execution of the instrument should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources.

If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement. The rule of strict construction should not be employed, however, to defeat a restrictive covenant that is clear on its face, or is clear when considered in light of the surrounding circumstances."

(Quoting *Belleview Constr. Co. v. Rugby Hall Cmty. Ass'n,* 321 Md. 152, 157–58, 582 A.2d 493, 495–96 (1990) (internal citations, quotations, and modifications omitted)). Thus, as we see it, we are faced (potentially) with a three-step inquiry. First, we ask whether "the meaning of the instrument is ... clear from its terms." *MIE,* 398 Md. at 679, 922 A.2d at 522 (quoting *Belleview,* 321 Md. at 157, 582 A.2d at 495). If not, then, second, we look to "the circumstances surrounding the execution of the instrument ... [,] and apparent meaning and object of their stipulations should be gathered from all possible sources" in ascertaining the parties' intent. *MIE,* 398 Md. at 679, 922 A.2d at 522 (quoting *Belleview,* 321 Md. at 157, 582 A.2d at 495). Third, and finally, "if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail

and the ambiguity in a restriction will be resolved against the party seeking its enforcement." *MIE,* 398 Md. at 679, 922 A.2d at 522 (quoting *Belleview,* 321 Md. at 158, 582 A.2d at 495).

 In the present case, we need not travel beyond the first level of inquiry because we find that the meaning of the 1992 Declaration is abundantly clear. Paragraph 1 of the 1992 Declaration gives "Declarant"—identified in Recital 1 and 2 as "the owner of certain development rights with respect to 'Parcel [Two]' . . . , which were created and reserved . . . under that [1981 Declaration]" (then Purcell/Danac)—the option, until 1 January 2001, to enter into a ground lease with the owner of Parcel Two at $1,000.00 monthly. Further, Paragraph 2 of the 1992 Declaration provides that "[t]he following provisions shall apply to and govern the construction of any *Future Improvements* on Parcel [Two]. . . ." (Emphasis added.) Paragraph 1(c) defines "Future Improvements" as "[a]ny improvements constructed in the future on Parcel [Two], whether or not the same shall be constructed pursuant to such ground lease. . . ."

The restrictions on any such "Future Improvements"—*i.e.,* building only in the newly-created RDA, *etc.*—were not limited to the "Declarant" or any third-party developer. We count at least five instances in the 1992 Declaration in which clarification is given that such restrictions apply *"whether or not the [Future Improvements ] shall be undertaken pursuant to the ground lease. . . . " See, e.g.,* Paragraph 1(c) ("Any improvements constructed in the future on Parcel [Two], whether or not the same shall be constructed pursuant to such ground lease, shall hereinafter be referred to as the 'Future Improvements.' "); Paragraph 2 ("The following provisions shall apply to and govern the construction of any Future Improvements on Parcel [Two], whether or not the same shall be undertaken pursuant to the ground lease. . . ."); Paragraph 5 ("No construction of any Future Improvements on Parcel [Two], whether or not the same shall be undertaken pursuant to the ground lease described . . . above, shall be permitted, unless. . . ."); Paragraph 6 ("[T]he following restrictions shall

apply to all construction and development activities undertaken on Parcel [Two] in connection with the construction of any Future Improvements, whether or not the same shall be undertaken pursuant to the ground lease...."). If the foregoing was not clear enough, Paragraph 8 reiterates:

[N]otwithstanding anything in this Restated Declaration to the contrary, the parties hereto acknowledge that each and every right, obligation, restriction and limitation set forth in this Restated Declaration shall pertain to, and shall be fully applicable to, any future development activity on Parcel [Two] ... whether undertaken pursuant to the exercise by Declarant of its option to enter into such a ground lease or otherwise....

Notwithstanding the abundance of language suggesting that the 1992 Declaration's restrictions apply to anyone pursuing Future Improvements on Parcel Two (and not merely a third-party developer), Petitioner argues—in what the Court of Special Appeals deemed a "somewhat vague and confusing" manner—that "by virtue ... of the 1992 [Declaration], the restrictions imposed on development only apply to development of Parcel Two by the 'Developer,'" and that, accordingly, "to rule that the 1992 [Declaration] applied to the Owner of Parcel [Two] ... the lower courts were required to find that the term 'Developer' includes the Owner of Parcel Two." As that argument goes, if "Developer" and "Owner of Parcel Two" are one in the same, then there would be no reason to include both Paragraphs 6(d) and 7, which, aside from the former pertaining to "Developer" and the latter pertaining to "Owner of Parcel [Two]," both provide that that party "will not change any approaches, entrances or exits on Parcel [Two] without the prior written consent of each Parcel [One] Tenant, which consent shall not be unreasonably withheld."

This argument lacks merit. Paragraph 6 states merely that if a "Developer" (*i.e.*, the party undertaking the Future Improvements) should undertake to construct Future Improvements, the Developer may not change entrances or exits on Parcel Two without the consent of the tenants of Parcel One. Paragraph 7 provides that the Owner—who may or may not

be the "Developer"—may not change the entrances or exits on Parcel Two without the consent of the tenants of Parcel One. Thus, Petitioner is wrong when it says that "the only difference in the two provisions is that Paragraph 6 applies to 'Developer' and Paragraph 7 applies to the 'Owner of Parcel [Two].' " The difference is *when* those provisions apply; Paragraph 6 applies to the Developer in the event it undertakes Future Improvements; Paragraph 7 applies to the Owner of Parcel Two regardless of *whether it undertakes Future Improvements.*

Because the 1992 Declaration is clear facially that its development restrictions apply equally to the owner of Parcel Two, as it does to third-party developers, we think it unnecessary to consider "the circumstances surrounding the execution of the instrument." *MIE,* 398 Md. at 679, 922 A.2d at 522 (quoting *Belleview,* 321 Md. at 157, 582 A.2d at 495). Were we to go down that path, however, we would think it important to note that the 1984 litigation commenced after Ward refused consent to Danac's proposed development of Parcel Two with an office complex, complaining that Danac's plan would destroy the line of sight to Ward's entrance. Thus, in challenging Danac's rights to develop Parcel Two under the 1981 Declaration, Ward was seeking to protect the Parcel One tenants' line of sight to the retail store's entrance from Route 355. It is illogical to conclude that the 1992 Declaration, the culmination of approximately eight years of litigation over the potential development of Parcel Two, would be intended to protect the Parcel One tenant's line of sight from developments undertaken by third-party developers, but not by the owner of Parcel Two.

In summary, we hold that, barring an adequate and persuasive showing of prejudice to the owners of Parcel Three (a determination that may be made on remand), the 1992 Declaration is a valid and enforceable modification of the 1981 Declaration. Therefore, we hold also that the restrictions in the 1992 Declaration apply with equal force to Petitioner as they do to third-party developers of Parcel Two.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PETITIONER.

