25 A.3d 967

**HOVNANIAN LAND INVESTMENT GROUP, LLC, et al.**

v.

**ANNAPOLIS TOWNE CENTRE AT PAROLE, LLC.**

**No. 71, Sept. Term, 2010.**

Court of Appeals of Maryland.

July 20, 2011.

---

Philip A. Sechler (David M. Krinsky of Williams & Connolly LLP, Washington, D.C.); 1 James A. McGuire (McGuire, McGuire & Linden, P.A., Edgewater, MD), on brief, for petitioners.

Ira L. Oring (Brandi Phillips of Fedder and Garten Professional Association, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this case, we must revisit contracts with "non-waiver" clauses and determine whether and how a party to such a

contract can waive its requirements and conditions. Respondent, the owner of a large, mixed-use development near Annapolis, Maryland, agreed to sell a portion of the property to Petitioner, a developer, for the construction of a residential tower. The contract required certain conditions to be met by Respondent prior to the closing, and also contained a clause saying that any waiver or modification of the contract had to be in writing. After two years of negotiation by the parties, Petitioner terminated the agreement and refused to go to closing, alleging that Respondent failed to meet a condition precedent regarding the establishment of a maintenance fee system for the development's common areas.

Respondent filed a complaint in the Circuit Court for Anne Arundel County, seeking a declaratory judgment that Petitioner breached the contract. Petitioner, in its answer, alleged that the Respondent failed to meet the condition precedent regarding common area maintenance funding, and that this breach relieved it of its obligation to purchase the land at closing. The trial court, in granting summary judgment, held that the Petitioner *waived* the condition precedent regarding common area maintenance funding, even though there was no written waiver as required by the contract's non-waiver clause. The Court of Special Appeals affirmed. We granted certiorari, *Hovnanian Land v. Annapolis Towne Centre*, 415 Md. 337, 1 A.3d 467 (2010), to answer the following questions, rephrased for brevity and clarity: [1]

1) Can waiver of a contract right be inferred from a party's conduct where the contract contains an express "non-waiver" provision requiring any waiver to be in writing?

---

[1] The Petition for Writ of Certiorari presented the questions as follows:
1) In a matter of first impression for this Court, can waiver of a contract right be inferred from a party's conduct where the contract contains an express "non-waiver" provisions requiring any waiver to be in writing.
2) Did the Circuit Court err in finding that Petitioner, as a matter of law, waived (and is estopped from asserting) a contractual condition precedent where the contract contained a non-waiver provision, there was no such signed waiver, and there was no evidence that the

2) Did the Circuit Court err in finding that Petitioner waived the condition precedent in this case, when there was no signed waiver?

3) Did the seller strictly fulfill a condition precedent requiring it to "provide annual assessments against the office and retail portions of the Development" when it recorded a declaration that the seller will enter into separate, unrecorded contracts with "some of all Parcel Owners"?

We shall hold that a condition precedent may be waived by a party's conduct, despite a non-waiver clause. Whether Hovnanian's actions amounted to a waiver, however, was a dispute of material fact that could not be resolved on summary judgment. The question of whether Respondent strictly fulfilled the condition set forth in question (3) also involved material questions of fact, and so summary judgment was inappropriate. We shall therefore reverse and remand for further proceedings.

## FACTS AND LEGAL PROCEEDINGS

*1. The Annapolis Towne Centre and The Purchase Agreement*

Annapolis Towne Centre at Parole, LLC ("ATC"), the Respondent, is the owner and developer of a 33–acre, mixed-use development known as the Annapolis Towne Center at Parole (the "Development"). As contemplated by ATC, the entire project would be declared a land condominium pursuant to the Maryland Condominium Act. *See* Maryland Code, (1974, 2003

---

parties agreed to waive the requirements of the non-waiver provision itself?

3) Did the Circuit Court err in finding that a condition precedent requiring the seller of real property to record a declaration that "shall provide annual assessments against the office and retail portions of the Development" for the purpose of funding common area maintenance was strictly fulfilled by a declaration that did not provide any such assessments but rather allowed the seller to enter into unrecorded contracts with "some or all Parcel Owners"?

Repl.Vol.), § 11–101, *et seq.* of the Real Property Article. The "units" of ATC's land condominium were a mixture of office, retail, and residential parcels.[2] The Development also had one additional and unusual feature—the Declaration and plat showed a nominal common element of only one square foot. Areas that would typically be included in a common area were instead designated as the "Common Facilities Parcel."[3] ATC retained ownership of the Common Facilities Parcel even after the other parcels were sold, and planned to pay for its upkeep by collecting annual common area maintenance ("CAM") fees from each of the parcel owners.

This case deals with "Parcel 14" and "Parcel 15," residential parcels at the western end of the development, abutting Riva Road. As with the other residential parcels, ATC sought a residential developer to purchase these parcels and construct residential towers and parking garages. Petitioner Hovnanian Land Investment Group, LLC ("Hovnanian"),[4] a residential developer who, on March 3, 2005, entered into a Purchase and Development Agreement (the "Purchase Agreement") with HTC for Parcels 14 and 15. Under the Purchase Agreement, Hovnanian was to construct three residential towers on the properties, containing 550 residential units, each with a minimum of 1,300 net useable square feet.

Section 14 of the Purchase Agreement, titled "Seller's Undertakings," required ATC to meet certain obligations prior to the closing. Relevant here, Section 14(d) addressed the funding of common area maintenance ("CAM"):

---

**2.** Some of the residential parcel "units" would later be subdivided into a more traditional land condominium. The original Declaration classified those land condominiums as "Tier 2 Condominiums," and the purchasers of individual residential units as "Tier 2 Owners[.]"

**3.** The Common Facilities Parcel included roads, sidewalks, and parking areas, areas typically designated as common elements and owned in common by all parcel owners within the land condominium.

**4.** Hovnanian Land Investment Group, LLC is an affiliate of K. Hovnanian Homes of Maryland, LLC. In this opinion, we will refer to either entity as "Hovnanian," except when it is necessary to distinguish between the two.

... [ATC] shall be solely responsible for ... recording a declaration (the "Declaration") for the maintenance of the common areas of the Development [5]. . . . **The Declaration ... shall provide annual assessments against the office and retail portions of the Development** for the purpose of providing funds for the maintenance of the office and retail buildings and associated common areas. . . . The Declaration ... shall also provide that each owner of a condominium unit shall pay an annual fee of [$1,200], which annual fee shall increase at the rate of three percent (3%) per annum to be calculated on a per diem basis.

(Emphasis added).[6] The Purchase Agreement thus required ATC to establish predetermined CAM fees for Hovnanian's parcel, and provide CAM funding for the other parcels.

The Purchase Agreement stated that Hovnanian's obligation to go to closing "shall be conditioned upon completion" of the conditions precedent, and gave Hovnanian certain remedies in case ATC failed to meet them:

If [ATC] is unable or unwilling to complete or fulfill its obligations as set forth ... for the parcels to be closed upon, [Hovnanian] may at its option (i) close on said parcels to be closed upon notwithstanding [ATC's] failure but without waiving [ATC's] obligations to perform hereunder, or (ii) delay the applicable Closing until after [ATC] has satisfied its obligations, or (iii) terminate this Agreement and have its Deposit returned[.]

The Purchase Agreement also contained a non-waiver clause:

No change or modification of this Agreement shall be valid unless the same is in writing and signed by Purchaser

---

**5.** As an alternative to creating a declaration, the Purchase Agreement allowed ATC to create a separate umbrella association charged with maintaining the common areas. It is undisputed that ATC did not create such an association.

**6.** Section 14 of the Purchase Agreement also directed ATC to, *inter alia*, obtain easements, subdivide parcels, and obtain zoning approvals. The dispute in this appeal involves only the Common Area Maintenance fees provision.

and Seller. No purported or alleged waiver of any of the provisions of this Agreement shall be binding or effective unless in writing and signed by the party against whom it is sought to be enforced.

### 2. The Declaration and Dispute over Common Area Maintenance Funding

As described above, the Purchase Agreement required ATC to record a declaration providing for (1) a $1,200 annual CAM fee for residential unit holders and (2) annual assessments against the other parcel owners in the development. ATC drafted the provision for Common Area Maintenance in Section 10.2.4 of the Declaration, which read as follows:

> *Payment of Common Area Maintenance Costs.* While this Towne Centre Declaration is in effect, some or all Parcel Owners, Tier 2 Councils, Tier 2 Owners and/or other Persons shall periodically pay to [ATC] respective shares of the Common Area Maintenance Costs (each of which payments required to be made by any Person is referred to herein as a CAM charge) pursuant to one or more Recorded Supplemental Agreements between [ATC] and one or more of those Persons. [ATC] shall be responsible for payment of the rest of the Common Area Maintenance Costs, which [ATC] shall allocate among the parts of the Retail Component (except for the Target Parcel 11 Unit). [7]

The Declaration thus addressed the CAM funding responsibilities of other parcels with a placeholder provision, which prom-

---

7. To avoid confusion, we have excerpted a later draft of Section 10.2.4, first circulated on August 28, 2006. Earlier drafts of the Declaration contained a slightly different version of 10.2.4, although the differences are not relevant for the purposes of this appeal. Specifically, a version circulated July 21, 2006 included references to a "Special Covenants Period," during which the CAM payments would be required. ATC quickly abandoned the concept of a "Special Covenants Period" and opted to draft a Declaration which would be "perpetual in its duration." This modification was unrelated to any concerns raised by Hovnanian, and contained relevant references to "Supplemental Agreements." After the August 2006 revisions, Section 10.2.4 was not changed again.

ised future agreements with parcel owners in lieu of establishing, in the Declaration, a detailed funding mechanism in the Declaration.[8]

On May 11, 2006, ATC first provided Hovnanian with a draft of the Declaration, and a proposed Supplemental Agreement between Hovnanian and ATC. The draft Declaration indicated that CAM funding details would be handled in Supplemental Agreements with the parcel owners, and the draft Supplemental Agreement for Hovnanian included such a provision.

Counsel for Hovnanian responded on July 20, 2006, with a memo including questions and comments. Relevant here, Hovnanian posed four questions:

1) If Target stops paying its annual fees, what are the remedies? Who is authorized to pursue them? What are obligations of developer to pursue them?

2) Is developer also obligated to pay fees based upon square footage it owns or controls? If developer stops paying for any reason, what are the remedies and who is authorized to pursue them?

3) Why does 10.2.4 provide that "some" Parcel Owners etc shall pay share of CAM and not all? Who will not be obligated to pay?

* * *

5) Section 10 of Supplemental Agreement provides for recordation of Memorandum and not the Supplemental Agreement. Why? Aren't purchasers of residential units entitled to see the entire Supplemental Agreement since they are paying these monthly, annual fees beginning at $1200 per year and with 3% increases annually?

Hovnanian also provided comments regarding the draft Supplemental Agreement, stating: "[Hovnanian] wants the fees to

---

**8.** ATC would eventually enter into three such Supplemental Agreements; an unrecorded one with the Target Corporation regarding its retail parcel and two recorded agreements with other residential developers.

be payable by unit owners and not by [Hovnanian,]" and that "it must be clear that each unit owner must pay the annual fees directly to [ATC]." Hovnanian thus flagged the CAM fees provision of the Declaration for further discussion.

On July 25, 2006, counsel for ATC responded to Hovnanian's questions, as follows:

1) This project has been structured as though it were a traditional mixed-use center, with parcel sales to the residential developers. The residential developers are limited to a fixed CAM charge and the Developer is obligated to maintain the Common Facilities Parcel, which are all the streets and common parking areas. The Developer can pass those charges on to its retail tenants, or pay for them out of its pocket, but it is still obligated to maintain [the Common Facilities Parcel] in accordance with the documents. If Target doesn't pay its fees, the Developer can pursue Target or come up with the extra cash itself. The Developer has the same choice if the residential parcels don't pay their fees.

2) See # 1 but, in addition, if the Developer doesn't maintain the Common Facilities Parcel in accordance with the Declaration, any of the parcel owners can bring an action against it.

3) See # 1.

5) We have no problem recording this. Debbie had indicated that K–Hov might want to divide this charge up differently (with larger units paying larger portions) and we thought that fee would be included in your condominium documents for your parcels but recording the Supplemental Agreement is fine.

With regard to the Supplemental Agreement, ATC merely noted that those issues had been "Discussed."

ATC sent updated drafts of the Declaration to Hovnanian on August 1, 2006, and August 15, 2006. Each of these revisions contained substantially similar provisions regarding the use of Supplemental Agreements. Hovnanian provided ATC comments on the second draft on August 17, 2006.

These comments, addressing a number of issues in the Declaration, did not expressly address 10.2.4 or the specifics of CAM funding.

ATC circulated new drafts, with identical CAM sections, on August 28, 2006 and September 14, 2006. On September 18, 2006, Hovnanian provided detailed comments to the September 14 draft Declaration, including comments on the CAM funding provision.[9] Hovnanian stated, in relevant part:

> 3. Definition of Common Area Maintenance Costs. The definition seems to exclude real property taxes and fees to the Operator. These costs should be included in the CAM. If not, then we need to have a clear understanding of this to explain to our client. If this is variable depending on Parcel Owner, then perhaps this should be addressed by Supplemental Agreements if you deem it appropriate, but then the Declaration should so state. We need to understand this issue better.

ATC's counsel responded the same day, stating "Fees to [ATC] are included in CAM and we can add that. Taxes are not and Section 9.5 says at the end that some parcel owners are required by Supplemental agreements to pay them."

On October 12, 2006, ATC's counsel stated:

> In order to stay on our construction schedule at this project, we must file the [Declaration] by the end of this month. . . .
> We have received comments from some of you since the last version of the Declaration was circulated and [we] will be incorporating those to the extent we can. If anyone has comments that have not yet been submitted, please get those to us.

On October 30, 2006, ATC recorded its "Towne Centre Declaration" (the "Declaration"), and circulated the recorded version to Hovnanian on November 6, 2006.

On November 15, 2006, ATC and Hovnanian amended the Purchase Agreement. This amendment removed Hovnanian's

---

9. The majority of Hovnanian's comments dealt with other provisions in the Declaration.

obligation to purchase a portion of the property where one of the buildings was to be constructed, reduced the purchase price from $33,184,000 to $22,927,000, and allowed Hovnanian to extend the closing date from November 1, 2007 to February 1, 2008 by paying ATC an extension fee of $100,000.

In late 2006, ATC continued its negotiations with the Target Corporation, which was purchasing a large retail parcel in the project. On December 12, 2006, as those negotiations approached a close, counsel for ATC emailed Hovnanian, indicating that the revised Declaration would be recorded on December 20, 2006.

On December 15, 2006, counsel for Hovnanian responded with the following email:

> Once again, I am amazed at the ability of you and Greg [ ] to balance all of the varying interests in this project. I am submitting the following comments to the above draft.... There are not a lot of comments.

> * * *

> It appears that the payment of CAM for each Parcel, including Parcel 15, is going to be dealt with in the Supplemental Agreement.

The remainder of the e-mail addressed Section 10.2.2(b), which is not at issue in this case.[10]

ATC delayed the recording of the Amended Declaration until January. It circulated drafts on January 4, January 11, and January 16, 2007. After this last circulation, ATC and

---

10. The email continued:

Section 10.2.2(b) requires the Operator to be responsible for replacement of "capital" improvements due to ordinary wear and tear. This is as close as the Declaration seems to come to creating an obligation on the party of the Declarant or Operator to accumulate reserve funds for the repair or replacement of Common Area improvements. Will this statement allow [Hovnanian] to disclose to the ultimate residential unit purchaser that there is a reserve fund for future "capit[a]l" improvements in order to reduce the chances of a substantial special assessment in the future? Will we be disclosing that the Land Declaration requires the Developer to make up any costs beyond the annual CAM paid by owners of all the Parcels?

Hovnanian went back and forth regarding certain provisions in the Amended Declaration. On January 17, 2007, Hovnanian's counsel wrote:

... On behalf of [Hovnanian] I am providing the following comments regarding the January 4, 2007 version of the Declaration. These comments and questions are not new. We have raised them in the past and we thought that it was agreed that they would be made, but as you will see, we are not certain that the language that now exists addresses the concerns sufficiently.

\* \* \*

10.2.4. Payment of the Common Area Maintenance Costs. As I read Section 10.2.4 it provides, in relevant part, that Tier 2 Owners and/or other Persons shall periodically pay to [ATC] respective shares of the Common Area Maintenance Costs.... This language, together with the portion of Section 14d of the original Purchase and Development Agreement that has not been changed by the most recent amendment, has led me to interpret this above language to mean that [ATC] will begin assessing the annual CAM directly from each purchaser of a Tier 2 residential unit when that person settles from the builder[ ] of that Tier 2 residential condominium and will continue to do so per month until the full CAM has been collected (or the prorated amount for that first year). It is not my understanding that [Hovnanian], the Parcel Owner, or the Tier 2 Council of Unit Owners once the Tier 2 residential condominium is created will be doing the collection of the CAM from its future unit owners and remitting the same in lump sums to [ATC]. We need to confirm that [ATC] will pursue the individual Tier 2 unit owners for the annual fee of $1,200[.]

The next day, ATC's counsel replied and stated:

... I believe both of these issues can be dealt with in our Supplemental Agreement with Hovnanian, if need be.... On the [CAM issue], we do have a different understanding and we can talk about that. It has always been our intention to bill the Association for the total CAM due and

that the Association would collect from its members. It would be a total nightmare for the Towne Centre Council to be billing and chasing each individual condominium owner.... We can talk about that more. I'm sure we can both get comfortable with it.

We have been in the process of closing with Target since last Thursday and we are concluding today, with the recordation immediately after.

In another email on January 18, ATC reiterated that, because of practical limitations, it wanted to address Hovnanian's concerns in a Supplemental Agreement:

... That document was signed off by Target, Prudential and Bank of America last Thursday (the day set for the actual closing) and funding happened today based upon it. The title company has the entire package for recording and may be recording it this afternoon. We can't make any change at this point. I'm not sure a language change is even necessary on that but, if it is, we can address it in the Supplemental Agreement for your parcel.

On January 19, 2007, Hovnanian's counsel responded:

Not a problem. I'm fine with addressing this and our other concerns later (if it is appropriate for the Supplemental Agreement then I am fine with addressing them in that document), but please keep in mind that we have always made it clear that we have never given our final sign off on the recorded document, that we do have outstanding unresolved issues, and that we have only been giving our approval on the changes Target made to this latest draft, which happened very quickly, in an effort to meet your deadlines with Target. Our previous e-mails confirm this understanding but I wanted to confirm this in response to your last email. Therefore, I hope that you did not expect that any of the changes we may have needed in an amended Declaration made it to the one you are recording now, because they are not included at this point and remain outstanding.

ATC's counsel responded, also on January 19, 2007:

... We honestly feel that the issues you raised that needed to be addressed in the Amended Declaration have been and

that is why we have copied you and Earle on all the redrafts. Both of the other residential developers are OK with the recorded document. Greg was careful to include revisions we agreed upon at our last meeting. If any issues need to be dealt with, we need to do so in the Supplemental Agreement if possible. Now that Target has closed on their parcel, they will need to approve of any changes to the Declaration, which will be a difficult if not impossible process.

The next day, January 20, 2007, Hovnanian's counsel replied:

We were repeatedly told by you and Greg that we would address any of [Hovnanian's] open issues in an amended Declaration, and I have told the same to my client. If I did not have that comfort level from you, then I would have protested against recordation prior to my client signing off. I cannot rely on the comfort level of the other residential developers in order to get my client comfortable so I cannot focus on their satisfaction with the document. I'm absolutely fine with addressing our concerns in a Supplemental Agreement if it is possible and if it accurately resolves the concerns. If not, then we will have to amend the Declaration and work through it with Target. . . . I do not anticipate new problems, but some of our longstanding issues have not been addressed and we absolutely have to have my client's approval of this document.

On January 22, 2007, without further comment from Hovnanian, ATC recorded an Amended and Restated Declaration (the "Amended Declaration").

Over the next year, the project proceeded towards closing, with both parties making preparations. During this time, Hovnanian and ATC frequently communicated, though not specifically with regard to the Declaration's CAM provisions. The CAM provisions, apparently, were discussed at an April meeting, after which ATC sent an email discussing collateral

CAM fee issues.[11] On April 6, Hovnanian responded, saying only that it "need[ed] to set up a follow-up meeting on other condo doc issues[.]" After this communication, however, the record demonstrates that Hovnanian did not again mention the specifics of 10.2.4 or its use of Supplemental Agreements, in 2007.

As they approached the original closing date, November 1, 2007, Hovnanian paid $100,000 to extend that date to February 1, 2008. Yet, even with the delayed closing date, Hovnanian soon realized the extent to which the recent housing collapse had reached the markets.[12] Hovnanian began privately preparing an offer package to sell its interest in the project to another party. These attempts would prove unsuccessful.

Additionally, Hovnanian sought an additional extension and/or a discount from ATC throughout January of 2008.[13] The negotiations began to fall apart in late January, as the parties could not agree on an acceptable extension deal. Throughout these negotiations, Hovnanian referenced market difficulties as the major hangup. For example, the regional president at Hovnanian stated, in an email dated January 3, 2008, that the original purchase price "could work over time with the cooperation of the market but it doesn't now and unless things drastically and quickly improved, there is almost no discount that would work over the next 6 months." Simi-

---

11. The email discussed whether Hovnanian would disclose annual budgets to the residential unit owners, how ATC and Hovnanian would deal with unpaid CAM fees, and when liens would arise on Hovnanian's parcel.

12. This realization, and the potential that they would be unable to go to closing, was demonstrated through internal emails provided to the trial court.

13. The extension negotiations were conducted in a series of emails between David DeMarco, a regional president of Hovnanian, and Mike Dietrich, a principal of Greenberg Gibbons, ATC's principal. Hovnanian proposed a no-cost extension of six months, with discounts for earlier closing and monthly penalties for extensions beyond six months.

larly, in an email on January 30, 2008, the regional president wrote:

> Isn't something better than nothing plus we are still your best chance to get to closing as soon as possible? If the market and financing were available, we would be there. Do you think there is someone else who is willing to step up in this market and pay our Purchase Price less $4M (portion of our $7M deposit net to you after taxes).

After its last efforts to obtain an extension had failed, Hovnanian then turned to the Purchase Agreement and "attempted to ascertain whether all of the conditions precedent to closing were met."

### 3. Termination of the Purchase Agreement and Litigation

On February 1, 2008, Hovnanian's president sent a letter to ATC, asserting that ATC had failed to fulfill conditions precedent.

> The unfulfilled conditions include items contained in the following sections of the Agreement: Section 3(c), (d) and its subsections, (g)(h), Section 4 and Section 14(c) and (d).

On March 3, 2008, ATC responded in a letter asserting that the condition had been complied with, as the Amended Declaration provided for annual assessments through the use of Supplemental Agreements. The letter also asserted that Hovnanian had agreed to deal with the CAM fees in a Supplemental Agreement, a draft of which ATC included with the letter. Hovnanian disagreed, and faxed a letter to ATC the next day declaring that the Purchase Agreement was terminated for a failure to fulfill the conditions precedent.

ATC filed a complaint in the Circuit Court for Anne Arundel County,[14] seeking a declaratory judgment that Hovnanian had breached the contract, and other injunctive relief.[15] Hov-

---

**14.** ATC filed the complaint on February 29, 2008, before the final communications regarding ATC's alleged failure to meet the contractual conditions.

**15.** Specifically, ATC sought to stem any attempt by Hovnanian to recover permitting and development fees paid to Anne Arundel County.

nanian answered, claiming that its obligations were relieved by ATC's failure to comply with the condition precedent. Both parties filed motions for summary judgment on the issue of whether ATC had complied with the condition precedent regarding Section 14(d) and the CAM maintenance fees. The Circuit Court issued an order on February 24, 2008, granting ATC's motion for summary judgment on that issue.[16] In its opinion, it held that Section 10.2.4 of the Declaration "strictly complied" with Section 14(d) of the Purchase Agreement:

> ... In the context of this transaction, the only reasonable reading of § 14(d) is that ATC was required to establish a mechanism for the funding of the office and retail CAM charges, rather than specifying the amount of the assessments in the Declaration. Since parcels would ultimately be sold to a diverse selection of office and retail users ranging from large single users such as Target, to individual boutique stores, logic dictates that the assessments against individual Parcel owners would require a level of customization to reflect the nature and extent of each Parcel's ultimate use.

> Since it may be unrealistic to predict CAM costs into the future, due to changing the maintenance needs and expenses, it is logical that a condominium declaration establish a formula or methodology by which CAM charges can be determined in perpetuity, rather than establish a fixed amount.

> \* \* \*

> The court agrees with ATC that the Agreement does not require the Declaration to assess a particular dollar amount against the office and retail portions of the Development .... [and] the court finds that the requirement for assessing the office and retail portions of the Development was met by § 10.2.4 of the [Declaration.]

---

**16.** The Circuit Court had previously issued an order on February 4, 2009, which it vacated in the February 24 "Supplemental Order."

In an alternative holding, the Court concluded that Hovnanian waived the CAM funding condition through its actions:

> [Hovnanian's] waiver went beyond mere silence. In fact, while [Hovnanian], through its counsel, raised issues regarding other portions of the Declaration which are not the basis of any claim of default, it did not complain of those provisions which it now alleges entitled it to terminate the Purchase Agreement. After reviewing drafts of the Declaration which contained the supposedly offending language, [Hovnanian], through its counsel, acknowledged the applicable provisions and their impact, and never objected to these provisions.

> [Hovnanian] treated the Agreement as valid [from its recording on January 22, 2007] until February 1, 2008, when it became clear that its repeated requests for modification of the Purchase Agreement, or for a further extension to closing, would not be attainable.

After the parties agreed to dismiss the remaining claims, the Circuit Court entered a final judgment on March 12, 2009.

Hovnanian filed a timely notice of appeal to the Court of Special Appeals. Before that Court, Hovnanian criticized the Circuit Court's decision as ignoring the non-waiver clause in the contract. In an unreported opinion, the intermediate appellate court aligned with the Circuit Court, holding that:

> ... Hovnanian impliedly agreed to the mechanism by only raising objections not here relevant. It was clear for well over a year before February 1, 2008, that ATC could not strictly comply with section 14d, as Hovnanian now interprets 14d. While later actions by Hovnanian might be equivocal if taken out of context, in context they are unequivocal and support waiver and estoppel. Hovnanian's conduct supports the conclusion that it waived the non-waiver clause in the Agreement as well as the substantive conditions in Section 14d.

The Court of Special Appeals, determining that Hovnanian had waived the condition, did not reach the question of whether the Declaration strictly complied with the conditions of the

Purchase Agreement. Hovnanian then sought certiorari from this Court.

## DISCUSSION

### I. Waiver of Conditions Precedent and Non–Waiver Clauses

As a threshold issue, we consider Hovnanian's claim that a party may not waive a contract right through its conduct if the contract contains a "non-waiver" clause. Although Hovnanian casts this issue as "a matter of first impression," we find ample case law addressing the effect of similar clauses.

This Court's treatment of non-waiver clauses can be traced back to our decision in *Freeman v. Stanbern Const. Co.*, 205 Md. 71, 106 A.2d 50 (1954). There, in a dispute between a general contractor and its subcontractor, the trial court excluded testimony regarding an oral modification to the written contract, reasoning that any such modification was impermissible under a contractual requirement that modifications be approved in writing by the general contractor. *Id.* at 76, 106 A.2d at 53. On appeal, this Court disagreed that the existence of the clause was dispositive:

> ... The rule has been accepted by the Courts, both State and Federal, that, even though a written contract stipulates that it may not be varied except by an agreement in writing, nevertheless the parties, by a subsequent oral agreement, may modify it by mutual consent.
>
> \* \* \*
>
> We hold that a subsequent oral modification of a written contract may be established by a preponderance of the evidence. Of course, if the written contract provides that it shall not be varied except by an agreement in writing, it must appear that the parties understood that this clause was waived. However, such a clause may be waived by implication as well as by express agreement.

*Id.* at 79, 106 A.2d at 55.

In *Freeman,* we relied on opinions from two of our country's most preeminent jurists, Benjamin Cardozo and Oliver Wen-

dell Holmes, who each addressed similar clauses while on their respective state high courts. Judge Cardozo, writing for the Court of Appeals of New York, resoundingly rejected a party's attempt to rely on a non-waiver clause:

> Those who make a contract may unmake it. The clause which forbids a change may be changed like any other. The prohibition of oral waiver may itself be waived. * * * What is excluded by one act is restored by another. * * * Whenever two men contract, no limitation self-imposed can destroy their power to contract again.

*Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 122 N.E. 378, 381 (1919). We also relied on then-Judge Holmes' opinion in *Bartlett v. Stanchfield,* 148 Mass. 394, 19 N.E. 549, 550 (1889), where he reasoned:

> Attempts of parties to tie up by contract their freedom of dealing with each other are futile. The contract is a fact to be taken into account in interpreting the subsequent conduct of the plaintiff and the defendant, no doubt. But it cannot be assumed, as a matter of law, that the contract governed all that was done until it was renounced in so many words, because the parties had a right to renounce it in any way and by any mode of expression they saw fit. They could substitute a new oral contract by conduct and intimation, as well as by express words.

*Freeman* clearly instructs us that Maryland and other courts will readily look past a non-modification clause, and focus on the actions of the parties.

Ten years later, this Court considered, specifically, whether a party could impliedly waive *a condition precedent* in a contract that, under the statute of frauds, was required to be written. *See Bio–Ramo Drug Co. v. Abrams,* 229 Md. 494, 499, 184 A.2d 831, 833–35 (1962). In *Bio–Ramo,* a lease provided the tenant with an option to purchase the property, subject to a strict written notice requirement. The landlord orally agreed to the tenant's request to purchase the property, but the tenant did not provide written notice as required by the lease. Before this Court, the landlord argued that the

writing requirement was dispositive. We disagreed, and remanded to the trial court to determine whether waiver occurred. To support our holding, we quoted 2 Corbin, *Contracts,* § 310, which reads:

> If the plaintiff has failed to perform some condition precedent (express, implied, or constructive) to the defendant's duty under the written contract, and that failure was caused by the defendant himself, can the plaintiff get judgment on the written contract without performing the condition? The answer is clearly yes; and the cases generally support the answer * * *. This assumes that the non-performance of the condition was not caused by the plaintiff's own inability to perform, and that but for the defendant's request, agreement, or other conduct, the plaintiff would have performed the condition. If the defendant later repudiates or otherwise breaks the contract, he cannot use the plaintiff's failure to perform on time as a defense.
>
> * * *
>
> The foregoing principles apply even where the plaintiff's non-performance of a condition was caused by an oral agreement substituting something else. This is true even though the oral agreement is itself within the statute and unenforceable, and even though it was the plaintiff and not the defendant who proposed the substitution. If the plaintiff would have performed the condition but for the oral agreement with the defendant, he can enforce the written contract.

*Id.* at 500–01, 184 A.2d at 834. *See also id.* ("The statement in 4 Williston, *Contracts* (3d ed.), § 595, and the Restatement, Contracts, § 224, are to the same effect."). *Bio–Ramo* demonstrates that neither contractual writing requirements nor the statute of frauds prevent oral or implied waiver in all circumstances.

This Court next examined an attempt to prohibit modification to a contract by conduct in *Pumphrey v. Pelton,* 250 Md. 662, 245 A.2d 301 (1968). There, a contract between Dairy Queen and a franchisee forbade the franchisee from selling

non-Dairy Queen products, and the contract contained the following clause: "No waiver, in whole or in part, of any breach or violation of this contract shall be deemed a waiver of any subsequent breach or violation." *Id.* at 669, 245 A.2d at 305. Yet, the franchisor knew of non-Dairy Queen sales at the store from the inception of the contract, and acquiesced to the practice. In the ensuing dispute, the franchisor alleged an ongoing breach, and relied on the non-waiver clause as evidence that it had not agreed to allow the sales in question.

After recalling the duty of a party to assert its rights after a breach,[17] the *Pelton* Court expressed equitable concerns about allowing a party to hide behind a contractual provision when his actions suggested otherwise. It quoted Judge Learned Hand's observation that a party who remains silent "may have so conducted himself as impliedly to assure the newcomer that he does not object, and the newcomer may have built upon that assurance." *Pelton,* 250 Md. at 669, 245 A.2d at 305 (quoting *Dwinell–Wright Co. v. White House Milk Co.,* 132 F.2d 822, 825 (2d Cir.1943)). Recognizing the applicability of the doctrine of equitable estoppel, the Court said:

> The whole doctrine of equitable estoppel is a creature of equity and governed by equitable principles. It was educed to prevent the unconscientious and inequitable assertion of rights or enforcement of claims which might have existed or been enforceable, had not the conduct of a party, including his spoken and written words, his positive acts and his silence or negative omission to do anything, rendered it

---

**17.** The *Pelton* Court stated that, to avoid waiver, a party must "assert[ ] his intention to retain the rights accruing to him as a result of said breach[.]" *Pumphrey v. Pelton,* 250 Md. 662, 667, 245 A.2d 301, 304 (1968) (quoting *John B. Robeson v. Gardens,* 226 Md. 215, 222–24, 172 A.2d 529 (1961)). The *Pelton* Court supported this case law with excerpts from the existing treatises. *See* 3 Williston, *Contracts,* § 688 (Rev. ed.) (when a party to a contract "continue[s] in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable[.]"); Restatement of the Law of Contracts, § 309 ("Where the duty of a party to a bilateral contract has been discharged by a failure of a condition ... he is again subjected to the duty if he renders any further performance[.]"); 3 A Corbin, *Contracts,* § 755 (same).

inequitable and unconscionable to allow the rights or claims to be asserted or enforced.

*Id.* at 669–70, 245 A.2d at 305 (quoting *Johnson Lumber Co. v. Magruder,* 218 Md. 440, 447–448, 147 A.2d 208 (1958)). Finding these concerns weightier than a strict adherence to the contractual language, this Court held that the Dairy Queen franchisor had waived the contractual provision and therefore could not terminate the contract on those grounds. *Pelton,* 250 Md. at 671, 245 A.2d at 306.

Since *Pelton,* Maryland courts have consistently reaffirmed that a party can modify or waive contractual provisions despite a provision purporting to limit those abilities. *See Charles Burton Bldrs. v. L & S Constr. Co.,* 260 Md. 66, 87–89, 271 A.2d 534, 545–46 (1970) (project owner waived contractual provision requiring that additional work by contractor be in writing by requesting and accepting the extra work); *Taylor v. University Nat'l Bank,* 263 Md. 59, 282 A.2d 91 (1971) (although original contract with non-waiver clause specified that later sales of notes would be "without recourse," the parties negotiations and later agreement indicated waiver of that provision); *University Nat'l Bank v. Wolfe,* 279 Md. 512, 369 A.2d 570 (1977) (contract's writing requirement not dispositive on issue of later modification of that contract); *600 N. Frederick Rd., LLC v. Burlington Coat Factory of Md., LLC,* 419 Md. 413, 19 A.3d 837 (2011) (modification valid even though it did not comply with contractual writing and signature requirement).

The Maryland approach, moreover, is consistent with the universal approach of commentators to disfavor strict adherence to non-waiver or non-modification clauses. Corbin states:

Parties to a contract cannot, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement. At common law, an express provision in a written contract that no rescission or variation is valid unless it too is in writing will not invalidate a subsequent oral agreement to the contrary.

Similarly, a provision that an express condition of a promise or promises in the contract cannot be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective. The promisor still has the power to waive the condition, or be estopped by conduct from insisting upon it, to the same extent that he would have had this power without that provision.

8–40 Corbin, *Contracts,* § 40.13 (2011); *accord* 25 Williston, *Contracts,* § 39:17 (4th ed. 2008) ("It is well established that a party to a contract may waive a condition precedent to his or her own performance of a contractual duty" and that "contract remains enforceable despite the nonoccurrence of the condition.").[18]

Hovnanian disagrees that this case law controls here. Instead, Hovnanian attempts to separate this case from the herd by distinguishing between "mutual" waiver and waiver of a condition precedent:

... [Maryland] cases merely establish that contracts may be *mutually modified* orally or by conduct even if the original agreement contained a provision requiring that modifications be in writing. The underlying rationale of those cases is that such a modification produces a new agreement, and the original agreement is ended by the new one which contradicts it.

\* \* \*

This case ... *does not* present an example of parties who *mutually* waive or modify their contract. Rather, the Court of Special Appeals held that [Hovnanian] waived its right to insist on strict compliance with the closing conditions in the Purchase Agreement when it "rais[ed] objections not here relevant" while remaining silent about the failures that

---

**18.** As we noted in *Charles Burton Bldrs. v. L & S Constr. Co.,* 260 Md. 66, 87–89, 271 A.2d 534, 545–46 (1970), *Freeman v. Stanbern Constr. Co.,* 205 Md. 71, 106 A.2d 50 (1954), and its progeny are "in accord with the general law." (citing 17A C.J.S. Contracts § 377 c (1963); 6 Corbin, *Contracts* § 1294 (1962); 4 Williston, *Contracts,* § 591 (3rd ed.1961)).

ultimately constituted its basis for terminating the agreement. Neither the nature of waiver in general, nor the facts of this case in particular, present a situation where the parties mutually agreed to form a new agreement and thus end the original one.

(Emphasis in original) (quotation marks and citations omitted).

We are not persuaded. To be sure, our case law does require mutual knowledge and acceptance, whether implicit or explicit, of the non-conforming action. *See Myers v. Kayhoe,* 391 Md. 188, 206–07, 892 A.2d 520, 531–32 (2006) (finding no waiver from one party's statement because that statement was not communicated to the other party); *DIRECTV, Inc. v. Mattingly,* 376 Md. 302, 829 A.2d 626 (2003) (finding no modification occurred when one party merely presented a modified contract to the other, with no evidence that the receiving party accepted or knew of the changes). Here, however, the alleged non-conformance was "mutual" in that ATC drafted and proposed the assertedly non-compliant declaration while Hovnanian scrutinized it and provided substantial feedback. Moreover, a condition precedent usually benefits *one* of the two parties, and the benefitted party's actions will weigh more heavily. *See Traylor v. Grafton,* 273 Md. 649, 688, 332 A.2d 651, 674 (A performance condition created by a financing contingency clause in a real estate sale contract may be "altered by the parties or waived by the one for whose benefit the condition was made."); *BarGale Indus., Inc. v. Robert Realty Co.,* 275 Md. 638, 645, 343 A.2d 529, 534 (1975) (promisee waived condition regarding value of mortgage commitment by *accepting proposal* of promisor for less than the amount specified in the contract).

Moreover, our treatment of non-waiver clauses is clearly not limited to changes that can be cast as "mutual modifications." Taken as a whole, our caselaw shows a persistent unwillingness to give dispositive and preclusive effect to contractual limitations on future changes to that contract. This approach applies to the entire catalogue of possible alterations in contractual rights and obligations, whether it is mutual modification, novation, waiver of remedies, or, as here, a waiver of

condition precedent. A requirement that waiver must be "mutual" is an evidentiary hurdle, not a categorical limitation.

Hovnanian further argues that the principles of freedom of contract require enforcement of the non-waiver clause, despite any other actions of the parties. Hovnanian criticizes the Court of Special Appeals's decision as "contrary to the fundamental principles of Maryland contract law," specifically the "central principle . . . that unambiguous contract provisions such as [Section 14(d) ] are to be enforced as written[,]" and cites *Kasten Const. Co. v. Rod Enters., Inc.*, 268 Md. 318, 330, 301 A.2d 12, 19 (1973) for the proposition that the courts should not, "under the guise of construction, rewrite the contract made by the parties."

 We have recently rejected a similar argument, and held that the freedom of contract does not guarantee the validity of a non-waiver clause:

> Generally, where the language of a contract is unambiguous, its plain meaning will be given effect. There are exceptions, however, to this rule. For instance, the common law rule **is that even where the contract specifically states that no non-written modification will be recognized, the parties may yet alter their agreement by parol negotiation.**

*600 N. Frederick Rd.*, 419 Md. at 438, 19 A.3d at 852 (emphasis added) (quotation marks and citations omitted). As *600 N. Frederick Road* reaffirms, the freedom to contract is not limited to the contract as written. Instead, the freedom to contract includes the freedom to alter that contract. Hovnanian was free, after signing the initial contract, to waive a condition for which it had bargained. *See, e.g.*, 8–40 Corbin on Contracts § 40.13 (2011) ("Parties to a contract cannot, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement."). Provisions in a contract which purport to limit this ability of parties to modify their contract, implicitly or explicitly, are disfavored. Accordingly, we agree with the Court of Special Appeals that a party may waive, by its

actions or statements, a condition precedent in a contract, even when that contract has a non-waiver clause.

## II. The Alleged "Waiver" In This Case

■ We next review the Circuit Court's grant of ATC's motion for summary judgment. The Circuit Court, apparently at the suggestion of the parties, resolved the issue on summary judgment, concluding as a matter of law that Hovnanian had waived the condition precedent.

■ Yet, "whether subsequent conduct of the parties amounts to a modification or waiver of their contract is generally a question of fact to be decided by the trier of fact." *University Nat'l Bank v. Wolfe*, 279 Md. 512, 523, 369 A.2d 570, 576 (1977). *See also Bio–Ramo Drug Co.*, 229 Md. 494, 184 A.2d 831 (1962) (reversing trial court's dismissal of claim based on non-waiver clause and remanding for determination, on the merits, as to whether condition was waived); *Battista v. Savings Bank of Baltimore*, 67 Md.App. 257, 507 A.2d 203 (1986) ("[T]he question of waiver was one for the jury[.]").

■ Indeed, the waiver inquiry requires resolution of many factual disputes and drawing of factual inferences. We look to the totality of a party's actions when determining whether waiver, or modification of the contract, has occurred. "Waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances." *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 531, 200 A.2d 166, 172 (1964). Waiver "may result from implication and usage, or from any understanding between the parties which is of a character to satisfy the mind that a waiver is intended." *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 360–61, 322 A.2d 866, 879 (1974). "[A]cts relied upon as constituting a waiver of the provisions' of a contract must be inconsistent with an intention to insist upon enforcing such provisions." *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 109, 468 A.2d 91 (1983) (quoting *BarGale Industries, Inc.*, 275 Md. at 643, 343 A.2d at 533).

Even if the relevant statements and communications of the parties are uncontested, the court must determine whether those statements (and actions) amounted to an understanding between the parties that the condition would no longer be enforceable.

In this inquiry, the court looks at the party's actions both *before* and *after* the alleged breach. A party can waive a condition precedent by agreeing, in advance, to a course of action which would not otherwise comply with a contractual requirement. *See, e.g., Taylor,* 263 Md. at 64, 282 A.2d at 94 ("What here took place was a modification of the contract ... by the very act of negotiating the notes" which were different than the original agreement.). A party may also waive a condition precedent *after a breach* by failing to assert its remedies for that breach. *See Nat'l School Studios, Inc. v. Mealey,* 211 Md. 116, 131, 126 A.2d 588, 596 (1956) ("It has been held in this State that one may waive the breach of the contract and later be bound by his election.") (citing *Key v. Dent,* 6 Md. 142 (1854) and *Orem v. Keelty,* 85 Md. 337, 36 A. 1030 (1897)). A party's inaction or silence is relevant, especially when that party is silent in response to a breach. *See Jaworski v. Jaworski,* 202 Md. 1, 10, 95 A.2d 95, 99 (1953) ("He who is silent when he ought to have spoken, will not be heard to speak when he ought to be silent.").

We do not mean to say that non-waiver clauses should be ignored altogether. Non-waiver clauses, although not favored by courts, must be considered by the trier of fact. The party alleging waiver must show an intent to waive both the contract provision at issue and the non-waiver clause. *See, e.g., Freeman,* 205 Md. at 79, 106 A.2d at 55 ("Of course, if the written contract provides that it shall not be varied except by an agreement in writing, it must appear that the parties understood that this clause was waived.").

Given the highly factual nature of the waiver inquiry, it is an uncommon case in which the issue can be resolved by summary judgment. In previous cases, we have reversed grants of summary judgment and remanded for resolution of the factual

disputes. *University Nat'l Bank v. Wolfe,* 279 Md. 512, 526, 369 A.2d 570, 578 (1977) (reversing trial court's ruling, as a matter of law, that party was negligent, and remanding for factual finding regarding waiver); *Bio–Ramo,* 229 Md. at 501, 184 A.2d at 834 (reversing trial court's dismissal of complaint and remanding for factual finding regarding waiver). Occasionally, however, the waiver is so obvious that a ruling can be made as a matter of law. *See Myers,* 391 Md. at 207, 892 A.2d at 531 (affirming grant of summary judgment because "[no] rational trier of fact [could] conclude that [the one statement at issue], standing alone, constituted an implied waiver"); [19] *DIRECTV, Inc. v. Mattingly,* 376 Md. at 311, 829 A.2d at 631 (summary judgment appropriate when only evidence of modification was presentment of modified contract, without any evidence of acceptance or knowledge of the changes).

Despite the parties' respective contentions that the undisputed facts require judgment in their respective favor, as a matter of law, we do not see this case as falling within the unusual category in which waiver is determined upon cross-motions for summary judgment. In reviewing the grant of ATC's motion for summary judgment, we review the record in the light most favorable to Hovnanian, the non-moving party. *See John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.,* 415 Md. 313, 325, 999 A.2d 1066, 1073 (2010), and cases cited therein. Under this standard of review, we must give Hovnanian the benefit of "any reasonable inferences that may be drawn from the [well-pleaded] facts[.]" *Rhoads v. Sommer,* 401 Md. 131, 148, 931 A.2d 508, 518 (2007). Summary judgment is thus appropriate only if there is "no genuine dispute as to any material fact and [ ] the party in

---

**19.** We were able to resolve the waiver issue in *Myers v. Kayhoe,* 391 Md. 188, 892 A.2d 520 (2006), because there was only one communication at issue: a buyer's statement to its real estate agent. The seller argued that the statement amounted to waiver, even though the real estate agent never communicated the statement to the seller. Because that issue was never communicated to the seller, we were able to determine, objectively, that there was no "understanding between the parties[.]" *Id.* at 206–07, 892 A.2d at 531.

whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501.

Under this standard, it is at least a "permissible inference" that Hovnanian did not waive the condition precedent. The record certainly demonstrates that Hovnanian had some disagreement or need for clarification on a number of issues regarding the CAM fees, including what was included in those fees and how they would be collected. In granting summary judgment for ATC, the Circuit Court limited the import of those communications through factual inferences. These determinations are not appropriate at the summary judgment stage.

The same rules apply with respect to Hovnanian's motion for summary judgment against ATC. Hovnanian, arguing against waiver, insists that "no facts [ ] demonstrated waiver of the non-waiver clause in particular." Hovnanian thus argues that the trial court, and the intermediate appellate court, "collapse[d] the analysis into a single inquiry and ignore[d] whether a separate waiver of the non-waiver clause occurred." Hovnanian avers that the only evidence on the issue of waiving the non-waiver clause is that "[Hovnanian] and ATC scrupulously observed the formality of amending the Purchase Agreement in writing, and the parties amended the Purchase Agreement in writing on each of the three occasions they agreed to modify its terms."

■■■ We disagree. The waiver of the non-waiver clause need not be explicit and independent from the underlying waiver; rather, waiver of that clause may be implied from the very actions which imply waiver of the condition precedent, as our previous cases demonstrate. *See, e.g. Freeman,* 205 Md. 71, 106 A.2d 50 (in contract with written modification clause, oral waiver of contract conditions was valid even though there was no separate waiver of modification clause); *Taylor,* 263 Md. 59, 282 A.2d 91 (party waived both "no recourse" clause and formal writing requirement by signing later agreements "with full recourse"); *Charles Burton Builders, Inc. v. L & S Constr. Co.,* 260 Md. 66, 271 A.2d 534 (1970) (project owner

waived contract's writing requirement and provision regarding "extra work" by requesting and accepting that extra work; no separate or explicit evidence of waiver of writing requirement).[20] It is only necessary that the trier of fact consider the non-waiver clause in its deliberations.

Hovnanian also argues that the "integration" clauses contained within the formal amendments to the Purchase Agreement foreclose a finding of any oral or implied waiver.[21] Maryland law generally recognizes the validity and effect of integration clauses. *See, e.g., Pumphrey v. Kehoe*, 261 Md. 496, 505, 276 A.2d 194, 199 (1971) (an integration clause, "although not absolutely conclusive, is indicative of the intention of the parties to finalize their complete understanding in the written contract[.]"); *Kasten Constr. Co. v. Rod Enterprises, Inc.*, 268 Md. 318, 301 A.2d 12 (1973) (courts generally should not look beyond the contract to evidence of prior statements or agreements, especially when contract contains integration clause). The last integration clause here was contained in the June 27, 2007 amendment, which, by reaffirming the original contract, purported to be a complete summary of the "**prior** agreements, conditions, [and] undertakings between the parties[.]" (Emphasis added). As Hovnanian argues, such an integration clause can be seen as wiping clear

---

**20.** Hovnanian's approach would further raise equitable concerns. Under its interpretation of the law, a party could explicitly waive a condition, and induce reliance by the other party, while holding back the "trump" card of the non-waiver clause. Neither our precedents nor equitable principles allow this result.

**21.** Each of the written amendments, entered into on May 3, 2005, November 15, 2006, and June 27, 2007, contained the following clause:

... Except as amended herein, this Amendment, together with the Agreement, constitutes the entire understanding of the parties with respect to the Property. The Agreement and all terms and conditions therein are hereby ratified, confirmed, reinstated and otherwise in full force and effect, binding upon Seller and Purchaser, and nothing contained in this Amendment shall be construed to relieve either Seller or Purchaser of any obligations as set forth in the Agreement, except as herein specifically modified.

any prior oral or implied agreements that were not included in the contract.

But there is evidence of waiver occurring *after* this last integration clause. As ATC describes, Hovnanian continued its silence regarding the alleged breach of Section 14(d) for six months, and allegedly took multiple actions that reaffirmed the existence of the contract, including paying $100,000 to extend the closing date from November 1, 2007 to February 1, 2008. A trier of fact could reasonably conclude that Hovnanian's later silence about the condition precedent, coupled with actions indicating it considered the condition fulfilled, constituted a modification or waiver of the condition *after* the last integration clause.

### III. Strict Fulfillment of the Condition Precedent

The Circuit Court held, in the alternative, that the Amended Declaration strictly fulfilled the condition precedent of Section 14(d) in the Purchase Agreement.

The condition precedent read as follows:

... [ATC] shall be solely responsible for ... recording a declaration (the "Declaration") for the maintenance of the common areas of the Development[.] ... **The Declaration ... shall provide annual assessments against the office and retail portions of the Development** for the purpose of providing funds for the maintenance of the office and retail buildings and associated common areas[.] ... The Declaration ... shall also provide that each owner of a condominium unit shall pay an annual fee of [$1,200], which annual fee shall increase at the rate of three percent (3%) annum to be calculated on a per diem basis.

(Emphasis added).

ATC drafted the provision for Common Area Maintenance in Section 10.2.4 of the Declaration, which read as follows:

... [S]ome or all Parcel Owners, Tier 2 Councils, Tier 2 Owners and/or other Persons shall periodically pay to [ATC] respective shares of the Common Area Maintenance Costs ... pursuant to one or more Recorded Supplemental Agree-

ments[.] ... [ATC] shall be responsible for payment of the rest of the Common Area Maintenance Costs, which [ATC] shall allocate among the parts of the Retail Component (except for the Target Parcel 11 Unit).

The Circuit Court held that Section 10.2.4 of the Declaration strictly fulfilled Section 14(d) of the Purchase Agreement. Section 14(d) requires ATC to "provide annual assessments" *in* the Declaration. The Circuit Court interpreted this passage to merely require a "mechanism" for CAM funding, and held that the Supplemental Agreements were part of the recorded Declaration by way of incorporation. The Circuit Court declared that this interpretation was the "only reasonable reading of [§ 14(d).]"

To uphold the summary judgment, we must conclude that the Circuit Court's interpretation of Section 14(d) was the only reasonable one. We cannot do so. Hovnanian strongly disputes that the condition could be satisfied with a promise of future agreements, and claims that ATC's mechanism deprives it of protections that a more detailed provision in the Declaration was supposed to have provided. In the context of this mixed-use development, a fact-finder could find Hovnanian's view the most reasonable. The funding for upkeep of common areas is an important, and heavily negotiated, issue in mixed-use and commercial developments. The specific funding provisions may be especially important to a tenant in a project which is dominated by a major tenant:

> ... Although most landlords agree to credit cost contributions of major tenants before determining a tenant's pro rata share, if that major tenant is not paying its full share, the rest of the tenants end up making up the deficiency. Major tenants often do not pay their full pro rata share, primarily because of the strength of their leverage in lease negotiations.

Marc E. Betesh & Nancy M. Davids, *Negotiating Common Area Maintenance Costs*, 23 *Probate & Property* 40, 42 (2009). Moreover, due to the common area scheme in this project, wherein the ATC entity would be responsible for Common

Area Maintenance, rather than a jointly-managed condominium association, Hovnanian had no direct recourse against any other tenant that failed to pay its CAM obligations.

Given these concerns, and the factual dispute about how the Section 14(d) condition precedent could be satisfied, we hold that the grant of summary judgment was inappropriate. Although a court may often be able to determine, as a matter of law, that a condition precedent was strictly fulfilled, that is not so in this case. The trier of fact should determine this issue on remand.

## CONCLUSION

In inquiring whether a party has waived a contractual right, the existence of a non-waiver clause is not dispositive. Instead, Maryland law focuses on the actions of the party, and will find waiver where the actions or the words of the party clearly indicate such an intent. When a contract has a non-waiver clause, a party claiming waiver must show a clear intent to waive both the non-waiver clause and the underlying contract provision. Waiver of a non-waiver clause may be shown through the same actions that prove waiver of the contract clause at issue. The Circuit Court's conclusion on the waiver issue, as well the interpretation of the condition precedent, required it to resolve factual disputes and draw inferences regarding the intent of the parties. Resolution of those issues at summary judgment was therefore inappropriate.

**JUDGMENT OF THE COURT OF SPECIAL REVERSED. REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT AND REMAND TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE SPLIT EVENLY BETWEEN THE PARTIES.**

Chief Judge BELL joins this decision in judgment only.